Joseph Anthony ACCARDI, Stephen Morales and Herman John Doming, Appellants,

v.

UNITED STATES of America, Appellee.

No. 16467.

United States Court of Appeals
Fifth Circuit.

June 30, 1958.

Rehearing Denied Aug. 27, 1958.

---

WISDOM, Circuit Judge.

The question before us is whether the conviction of Joseph Anthony Accardi should be set aside on the ground that *as a matter of law* he was entrapped by government agents.

Accardi, Herman John Doming, Stephen (Steamboat) Morales, and Anthony Segro were indicted for conspiracy to acquire and transfer marihuana in violation of the law.[1] Segro pleaded guilty; the other defendants went to trial. The issue of entrapment went to the jury.[2] The jury found all the defendants guilty. But—it recommended leniency for Accardi. Each defendant was sentenced to five years imprisonment. Doming and Morales argue that if the defense of entrapment is valid as to Accardi, it is valid as to them.

### I.

Some time in March, 1955, Michael G. Picini, a federal narcotics agent, was working as an undercover man in an investigation in Memphis, Tennessee. Working with him was Charles Underwood, an informer and special employee of the Bureau of Narcotics. Underwood had been employed by Eddie Collier, then under investigation. Accardi was a friend of Collier's and of Underwood's. Acting upon information supplied by Collier, Picini and Underwood went to Accardi's place of business in Memphis, the Bluff City Refrigeration Company in Memphis. Underwood introduced Picini to Accardi as Mike Philano of Philadelphia.

According to Picini, this is what happened. Picini told Accardi that Eddie Collier had said that Accardi would supply him with marihuana. Accardi said that he had none at the time but volunteered the information that "he had a connection in New Orleans". He did not want to talk about it in his place of business; he suggested that they go across the street to a restaurant to dis-

Marvin B. Gambill, Memphis, Tenn., Hilary J. Gaudin, Richard C. Baldwin, G. W. Gill, New Orleans, La., for appellants.

Jack C. Benjamin, Asst. U. S. Atty., M. Hepburn Many, U. S. Atty., New Orleans, La., for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

---

1. 18 U.S.C. § 371; 26 U.S.C. §§ 4744(a) and 4742(a), 4744(2) and 4742(a) of the Internal Revenue Code of 1954, Marihuana Tax Act of 1937, as amended.

2. The charge to the jury is not in issue here.

cuss it. Picini told Accardi that he was looking for both heroin and marihuana. Accardi said that he would meet Picini and Underwood an hour or so later at the Pig and Whistle restaurant. They met, and Accardi went into a drug store near there, "looked into a little notebook and got a number", and put in a telephone call to New Orleans. Picini overheard him ask for Steamboat. Accardi said that he was unable to reach his man in New Orleans but that he would try to reach him later that day and then get in touch with Picini. Later Picini called Accardi who said that he would meet him at the King Cotton Hotel the next morning. Accardi arrived at the hotel in the morning and promptly put in another call to Steamboat in New Orleans. The call was not completed to Steamboat, but Accardi told the agent "that he had made arrangements for someone in New Orleans to call [Picini] at Room 619 in the King Cotton Hotel". The following day, May 6, Picini received a telephone call at the hotel. He was not there at the time. A message was left for him to call a certain number in New Orleans and ask for "Steve". Picini called Steve. Steve "told me that his sister had told him to call this number; that Joe Accardi had left word for him to call that number. He asked me what I wanted and I told him I was looking for some marihuana and some heroin. He said, 'Well, we can take care of you down here. How soon can you get down?' I told him at that time that I would call him in a couple of days. He told me to call that number again and ask for 'Steamboat'." May 9 Picini called the same number and talked with Steamboat. He said that he had "made arrangements with guys across the river and that they could supply me with anything I wanted; for me to come to New Orleans". May 13 Picini received a call from Steamboat who told him "that the boys were waiting for me to come down; that they had the stuff ready". May 14, at a motel in New Orleans, in the presence of Doming and Steamboat Morales, Picini paid Anthony Segro $2,000 for four and a half gallons of marihuana. No efforts were made to arrest the defendants at that time and on June 18 Picini was negotiating with Segro for the purchase of heroin. Sometime after May 14 and before June 18 Picini telephoned Accardi in Memphis and offered him a fee. Accardi told Picini that he would get in touch with him later. He did not, for reasons of his own.

Underwood, who was present at the first two meetings with Accardi, corroborated Picini. Picini and Underwood testified that Accardi needed no urging; Accardi put the agent in touch with his supplier in New Orleans as promptly as long distance telephoning permitted. The agent denied that he had enticed the accused by holding out the lure of buying a deep freeze refrigerator for his wife; he did not discuss the subject but once and then only in the restaurant, making conversation. Underwood did not recall the conversation.

Needless to say, Accardi's account of the facts differs radically from the agent's. He testified that Underwood introduced Picini as a friend from Philadelphia who wanted to buy a deep freeze refrigerator for his wife. They discussed "models and kinds with reference to a possible purchase for his wife". When they went across the street Picini put his arms across Accardi's shoulders and began talking Italian. Accardi told Picini, "I don't know nobody [who has marihuana] and I don't want to be associated with it. I'm in the refrigeration business". "Finally, Mike kept egging me on to—if I knew anybody he could buy my marihuana from and I kept denying it —then it dawned on me that he might be able to buy some from a man named 'Steamboat' in New Orleans". Accardi had never seen or heard of any of the defendants except Steamboat Morales. He had seen him once in a crowded bar in New Orleans on New Year's Eve. A friend had said that "anytime you all need any weed, that Steamboat knows somebody that could help you out". Accardi attempted to reach Steamboat Morales at the Sho-Bar Club in New

Orleans. Steamboat was not there but he was given a number where Steamboat could be reached. Accardi returned the change Picini had given him to telephone. "Here's the number \* \* \* You go ahead on and call yourself". Later that day, or the next morning, Picini invited him to come to the King Cotton Hotel to meet him. Accardi expected to talk about the deep freeze refrigerator. Instead Picini again asked him to call his contact in New Orleans. Again Accardi failed to reach Steamboat. He then told Picini that he was through. That was the last he had to do with Picini until sometime around the end of May when Picini telephoned him, invited him to dinner, and told him that he would give him a fee. Accardi refused it. "I don't want to have none of that money, don't want to have nothing to do with this sort of business and I hung up".

## II.

This Court has frequently dealt with the defense of entrapment.[3] Since 1932 we have often quoted and relied on Sorrells v. United States, 287 U.S. 435, 53 S. Ct. 210, 77 L.Ed. 413. In that case the Supreme Court read a legislative intent into criminal statutes that Congress could not have intended that its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and punish them. Whatever intent Congress had, if any, as to entrapment, the criteria laid down in Sorrells relate to the "intention" of the accused to commit an offense he would not have committed but for the inducement of the government agents: "The predisposition and criminal design of the defendant are relevant. But the issues raised and the evidence adduced must be pertinent to the controlling question whether the defendant is a person otherwise innocent whom the Government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials."

In Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 821, 2 L.Ed.2d 848, the majority of the court adopted the rationale of the majority in Sorrells: "However, the fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment. Entrapment occurs only when the criminal conduct was 'the product of the creative activity' of law-enforcement officials. See 287 U.S. at pages 441, 451, 53 S.Ct. at pages 212, 216. To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." This rationale throws the main emphasis on the "predisposition" of the accused to commit the crime. We take it that "predisposition" means something more than "disposition" and is intended to refer to the character and intentions of the accused as an "unwary innocent" (if the conviction is reversed) or as an "unwary criminal" (if conviction is affirmed).

The majority opinions in the Sorrells and Sherman cases, and the uniform holdings in this circuit, make the factual issue of entrapment a question for the jury—unless as a matter of law the accused has established beyond a reasonable doubt that he was entrapped. In this case, we cannot say as a matter of law that Accardi was entrapped. In the Sherman case the court relied on undis-

3. Saucedo v. United States, 5 Cir., 1920, 268 F.2d 830; Aultman v. United States, 5 Cir., 1923, 289 F.2d 251; Ybor v. United States, 5 Cir., 1929, 31 F.2d 42; Vamas v. United States, 5 Cir., 1926, 13 F.2d 347; Gargano v. United States, 5 Cir., 1928, 24 F.2d 625; Hunter v. United States, 5 Cir., 1932, 62 F.2d 217; Wall v. United States, 5 Cir., 1933, 65 F.2d 993; Hill v. United States, 5 Cir., 1934, 23 F.2d 223; Weathers v. United States, 5 Cir., 1941, 117 F.2d 585; Demos v. United States, 5 Cir., 1953, 205 F.2d 596; Hamilton v. United States, 5 Cir., 1955, 221 F.2d 611; Rodriguez v. United States, 5 Cir., 1955, 227 F.2d 912; Kivette v. United States, 5 Cir., 1956, 230 F.2d 749; Henderson v. United States, 5 Cir., 1956, 237 F.2d 169.

puted evidence.[4]  Here, there is so much conflicting testimony on material facts bearing on the inducement and Accardi's readiness or willingness to commit the offense charged, that the issue was properly submitted to the jury.

■ Approaching the question in its light most favorable to the government, there was ample evidence for the jury to draw the inference of guilt with no entrapment.  According to Picini and Underwood, Accardi showed no hesitancy. Accardi volunteered the information that he had a connection in New Orleans. He looked in a little notebook before telephoning Steamboat.  He met three times within twenty-four hours to discuss the transaction.  Steve and Steamboat were willing to deal with Picini by telephone, after they learned that he had been referred to them by Accardi.  To believe Accardi's story that he did not know Segro and Doming and he had seen Morales only once, and then in a crowded bar in New Orleans on New Year's Eve —the jury would have to infer that the other defendants are uniquely naive and trusting traffickers in narcotics willing to return a stranger's telephone call and negotiate by telephone a narcotics sale with a stranger.  Or the jury could infer that Accardi was well known to the other defendants, was part of their conspiracy, and had the "predisposition" to commit the offense charged; an "unwary criminal".

### III.

■ Detection of narcotics offenders is difficult. They deal by stealth and stratagem; they must be detected by stealth and stratagem.  Nevertheless, even in ferreting out such law violators, government detection methods must measure up to reasonably decent, civilized standards for the proper use of government power.  Police methods designed to tempt innocent persons into crime are as objectionable as the coerced confession and the unlawful search.  The majority opinion in Sherman reaffirms the emphasis on the defendant's intention or readiness to commit the crime, as basic in rebutting entrapment; but the Court by no means downgrades the duty of scrutinizing closely the conduct of the government agents.[5]

4.  Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848, was a strong case.  The undisputed evidence showed that the government informer and the accused were both under treatment from the same physician for drug addiction. There were recurring meetings and exchanges of mutual experiences in regard to drug addiction.  The informer had to make repeated requests before he overcame the defendant's refusal first and then his evasiveness and hesitancy. There was no evidence that Sherman was in the narcotics trade.  The government informer finally enticed the accused who was attempting to avoid narcotics, not only into carrying out an illegal sale but also into returning to the drug habit. The Court concluded from the undisputed evidence that entrapment was established as a matter of law.

5.  In the concurring opinion in Sherman v. United States, Mr. Justice Frankfurter with whom Justices Douglas, Harlan and Brennan concurred, observed that: "The courts refuse to convict an entrapped defendant, not because his conduct falls outside the proscription of the statute, but because, even if his guilt be admitted, the methods employed on behalf of the Government to bring about conviction cannot be countenanced. * * * Public confidence in the fair and honorable administration of justice, upon which ultimately depends the rule of law, is the transcending value at stake."  The opinion quotes Mr. Justice Holmes in Olmstead v. United States, 277 U.S. 438, 470, 48 S.Ct. 564, 72 L.Ed. 944: " '[F]or my part I think it a less evil that some criminals should escape than that the government should play an ignoble part.' Insofar as they are used as instrumentalities in the administration of criminal justice, the federal courts have an obligation to set their face against enforcement of the law by lawless means or means that violate rationally vindicated standards of justice, and to refuse to sustain such methods by effectuating them.  They do this in the exercise of a recognized jurisdiction to formulate and apply 'proper standards for the enforcement of the federal criminal law in the federal courts' ".

The concurring opinion in the Sherman case argues that: "The crucial question * * * is whether the police conduct revealed in the particular case falls be-

In addition therefore to considering the predisposition (character and general intention) of the accused, as clearly required under the Sorrells and Sherman cases, we have weighed carefully the conduct of the government agents. Here, we cannot say that the undisputed evidence shows that the government agents exceeded the proper use of government power. We cannot say that by guile and low cunning, unsuitable for law enforcement officers, agent provocateurs enticed into crime an unwary innocent who would otherwise have struggled within himself and resisted ordinary temptations. On such evidence as is undisputed, the agents' conduct does not shock the conscience of this Court. There was no entrapment as a matter of law.

Judgment is

Affirmed.

low standards, to which common feelings respond. for the proper use of governmental power. For answer it is wholly irrelevant to ask if the 'intention' to commit the crime originated with the defendant or government officers." This crucial question, the minority contend, is appropriate for the court, not the jury; only the court can give "significant guidance for official conduct * * * with the degree of certainty that the wise administration of justice demands". The majority, on the other hand, hold that the crucial question is the intention or readiness of the accused to commit the crime; that this is a factual issue for the jury *as part of its function of determining the guilt or innocence of the accused*—unless the court can decide it as a matter of law.

In spite of the sharp differences between the two opinions as to the crucial question in entrapment, the conceptual basis for the defense. and the role of the court, the language of the majority of the court, shows that they attach almost as much importance as the minority to the *conduct of the government agents*. There is scarcely a decibel's difference in their expressions of shock and outrage at the agents' methods. "The function of law enforcement is the prevention * * * not * * * the manufacturing of crime." The agents "beguiled" the accused, "play[ed] on the weaknesses of an innocent party", and ended by inducing him to return to the drug habit. "Law enforcement does not include methods such as these." The Court's statutory construction that Congress could not have intended its statutes to be enforced by government agents tempting innocent persons into violations is another way of saying that law enforcement officials may not prostitute government power. Similarly, in Sorrells v. United States, in construing the Prohibition Act to exclude enforcement by abuse of the processes of detection the Court said: "If the requirements of the highest public policy in the maintenance of the integrity of administration would preclude the enforcement of the statute in such circumstances as are present here, the same considerations justify the conclusion that the case lies outside the purview of the Act and that its general words should not be construed to demand a proceeding at once inconsistent with that policy and abhorrent to the sense of justice. This view does not derogate from the authority of the court to deal appropriately with abuses of its process and it obviates the objection to the exercise by the court of a *dispensing power in forbidding the prosecution* of one who is charged with conduct assumed to fall within the statute".