Herman Carter WALKER, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 18254.

United States Court of Appeals
Fifth Circuit.

Dec. 16, 1960.

Rehearing Denied Jan. 21, 1961.

Bernard A. Golding, Houston, Tex., for appellant.

Robert C. Maley, Jr., Asst. U. S. Atty., Myron M. Sheinfeld, Asst. U. S. Atty., William B. Butler, U. S. Atty., Houston, Tex., for appellee.

Before CAMERON and BROWN, Circuit Judges, and ESTES, District Judge.

ESTES, District Judge.

Herman Carter Walker, Appellant (hereinafter called defendant), was convicted in a trial by jury on all four counts of an indictment. Counts 1 and 3 charging unlawfully and knowingly receiving and facilitating the transportation and concealment of heroin hydrochloride, a narcotic drug, after it had been imported into the United States contrary to law, knowing it to have been imported contrary to law in violation of

21 U.S.C.A. § 174; Counts 2 and 4 charging selling the heroin hydrochloride not pursuant to a written order in violation of 26 U.S.C.A. § 4705. Counts 1 and 2 concern a transaction that took place on September 10, 1959. Counts 3 and 4 involve a transaction on September 24, 1959.

Defendant's motions for judgment of acquittal at the conclusion of the government's evidence and at the conclusion of all the evidence were overruled; and the Court sentenced defendant to serve ten years, generally, which by reason of a previous conviction for sale and possession of marihuana was the minimum sentence permitted by law [1] on any of the four counts, and a Ten Dollar fine to be paid.

The questions presented are whether as a matter of law defendant was entrapped or was "a mere purchasing agent who purchased narcotics with money supplied by a 'governmental informer' at no profit to him", whether the Court erred in refusing to submit to the jury the several written requests as to appellant's theory of the case, and whether defendant was denied due process of law.

Clifton Ray White, alias "Lovejoy", a government informer, testified that on September 10, 1959, shortly before 2:00 P.M. he called defendant on the telephone; defendant asked him what he wanted; and he told defendant that he wanted to buy some "stuff"; defendant asked him "how many pills did I want"; and he told defendant he wanted six. Then the informer called Bautista, a narcotics agent and advised him of the conversation and arrangements he had made with defendant. The informer met government agents Bautista and Ripa, was searched, received from them $42.00 in government funds for which he signed a receipt which stated the purpose for which the funds were to be used, and was driven to the drive-in cafe where he had arranged to meet defendant. The informer met defendant at about 2:00 P.M., conversed with him, then walked across the street with him where he handed defendant the $42.00. Defendant stooped down into a ditch and picked up a cigarette package which he handed to informer, who brought the package back to agent Bautista. In court, White and Bautista identified the package which was shown to contain six capsules of heroin hydrochloride.

Clifton Ray White, the informer admitted that he had a prior conviction of theft from the mails, that he had been using narcotics "on and off" since 1951; testified that he did not now use narcotics, was not under the influence of nar-

1. Both 21 U.S.C.A. § 174 and 26 U.S.C. § 4705 invoke the second offender—minimum sentence provisions of 26 U.S.C. § 7237. (Section 174 by its own language and Section 4705 by reference thereto in 26 U.S.C. § 7237(b).) Defendant's prior conviction for the sale and possession of marihuana under 26 U.S.C. § 4742 and § 4744 (formerly 26 U.S.C. § 2591(a) and Sec. 2593 of the 1939 Code) is a "prior conviction" under the second offender—minimum sentence provisions of 26 U.S.C. § 7237(c). 26 U.S.C.A. § 7237 (c), which defines a second or subsequent offense for the purpose of the mandatory second offense 10 years sentences imposed in 7237(b) and 21 U.S.C.A. § 174, states that it includes prior convictions "of any offense the penalty for which was provided in subsection (a) * * * of this section"; and subsection (a) of Section 7237 fixes the penalty for the violation of offenses described in "part I or part II of subchapter A of Chapter 39." Defendant's prior conviction of sale and possession of marihuana was under Title 26, Chapter 39, part II of subchapter A. Therefore, one who has previously been convicted under either 26 U.S.C. § 4742 or § 4744, as has defendant, and who is now convicted under either 21 U.S.C.A. § 174 or 26 U.S.C. § 4705 is subject to the 10 year minimum sentence. Phelps v. U. S., 5 Cir., 252 F.2d 49, 50, states: "21 U.S.C.A. § 174 makes it a crime to bring 'any narcotic drug' into the United States contrary to law. 21 U.S.C.A. § 176a relates specifically to smuggling marihuana * * *. For a second or subsequent offense (as determined under section 7237 (c) of the Internal Revenue Code of 1954), the offender shall be imprisoned for not less than ten or more than forty years and, in addition, may be fined not more than $20,000."

cotics, nor did he use them on September 10 or 24, that he had been arrested by narcotics agents in August 1959, and was now free on $500.00 bond, that he had agreed with narcotics agents to co-operate with them because he felt it was his duty, that he had not been promised anything, though he had been told that they would try to be more lenient with him if he cooperated.

Agents Ripa and Bautista gave corroborating testimony on informer White's testimony. They observed White at all times after searching him before they let him out of the car near the drive-in cafe, during his meeting with defendant and during his return with the cigarette package to the car and Bautista and Ripa.

White testified that on September 24, 1959, he called defendant on the telephone and told defendant that he wanted to buy some "stuff". Defendant asked informer "how much stuff did I want", and informer told defendant that "I wanted to buy a paper". Defendant told White that he "had to have $60.00" for this amount, and informer told defendant that the price "wasn't but $50.00", whereupon defendant told informer "he had to have ten more for himself for his trouble." After agreeing on a price of $60.00, arrangements were made for a meeting in front of the Cotton Exchange Building at 12:00 noon.

White contacted narcotics agents Ripa and Kelly who met White in front of the Cotton Exchange Building. Agent Ripa searched informer, gave him $60.00 in government funds and had him sign a receipt which stated the purpose for which the funds were to be used. A "couple or three minutes later" defendant drove up to the meeting place; informer gave defendant the $60.00; defendant drove off and returned in about twenty minutes to give White a "paper of stuff" which White turned over to narcotics agents and which was identified in court by White and by Agents Ripa and Kelly and shown to contain heroin hydrochloride.

Agents Ripa and Kelly gave testimony confirming meeting, searching, providing funds to White, and observing defendant drive up in front of the Cotton Exchange Building. Kelly testified to observing White at all times as White approached defendant's car. Kelly observed defendant roll down his window, White hand something to defendant and then return to Kelly while defendant drove off; then defendant's return some thirty minutes later with White going to defendant's car, defendant handing something to White and driving away while White returned to Kelly without putting his hands in his pockets to give Kelly a cellophane package containing a powder which was identified in court by White and by agent Kelly, and shown to be heroin hydrochloride.

On November 6, 1959, narcotics agents Ripa and Bautista arrested defendant, warned him of his constitutional rights and had a conversation with defendant in which defendant said that he had been selling heroin capsules at $7.00 a capsule, that he had been purchasing heroin from an individual he knew as Curley, that he had used heroin with Curley, and that he, the defendant, would "cap it up"; and sell it to four individuals whom he named.

Defendant took the stand; admitted a prior conviction in New York in 1944 on a plea of guilty of possession of marihuana, which marihuana he said belonged to a man who had roomed with him, but "I was the one that got caught with it"; testified that in 1953 he had been "held" with his wife and had testified in a case based on heroin that had come through the mails to the apartment house in which he lived; that he knew heroin was contraband, obtained secretly and clandestinely through a contact.

Defendant testified that he had known White only since about July or August, that he had met Curley at about the same time in a cafe, that he had had conversations with White about the procurement of narcotics, that he obtained narcotics from Curley for White two times before the indictment transactions of September 10 and September 24, that on these prior

**56**

occasions White "just asked me to go and get it," that White contacted him *"mostly* by telephone," that White just said simply that "he wanted to score"; that defendant "presumed he (White) used and wanted it"; that he called Curley because White asked him to, that when Curley asked defendant "where you at", "I *usually* tell him where I was". Defendant testified that he had had no written order for heroin and that he made no profit from these transactions, but that he "had some gas put in my car every now and then," and that "I got quite a lot of reimbursement for gas"; that before September 10 "there have been times when I have handed (heroin) to him (White)"; that he knew heroin was $7.00 a "cap"; that White went through him, defendant, because "I had a car", though defendant's car was not used on the September 10 transaction. In his testimony concerning the telephone conversation setting up the September 24 transaction when White complained about the $60.00 price, defendant said that White *"usually* said he would buy gas for me." Defendant further testified that White had said he was "sick" and "wanted to work that day and didn't want to take off, but he wanted to work." Defendant testified that he had never used heroin, but when asked on direct examination if he had told anyone that he had used it, answered: "Well, I may have told someone something like that, but I don't recall just telling him I had used heroin."

**I.**

Appellant cites Sherman v. U. S., 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848; Sorrells v. U. S., 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, and Wall v. U. S., 5 Cir., 65 F.2d 993, in support of his contention that he was entrapped by government agents as a matter of law.

As this court said in Washington v. U. S., 275 F.2d 687, 689, "under Sorrells, Sherman and Masciale,[2] the issue of entrapment is a question for the jury, unless as a matter of law the defendant has established beyond a reasonable doubt that he was entrapped * * In determining if there has been entrapment as a matter of law this Court has considered not only the predisposition of the accused but has weighed also the conduct of the government agents. Accardi v. United States."[3] From a résumé of the testimony set forth above, including circumstances indicating that the relationship between White and defendant was casual, defendant was willing to deal with White by telephone, the clandestine methods employed by him in hiding narcotics in the ditch, his previous experiences with illicit dealings in narcotics and his own conduct in both transactions, the jury could reasonably have concluded that defendant was a person engaged in illicit narcotic drugs traffic, "not an innocent person in whose mind the Government implanted a criminal design".[4] And the jury could have believed he had a "predisposition" and "intention or readiness" to commit the crimes charged, that these offenses were not "the product of the creative activity" of law enforcement officials.[5] In this case there was no such badgering or repeated requests of the defendant from persons with whom he was closely related which overcame a refusal or hesitancy of defendant to deal as in the Sherman case. As in Accardi we cannot say that the government agents exceeded the proper use of government power nor that their conduct was "abhorrent to the sense of justice"[6] of this court. There was no entrapment as a matter of law.

**II.**

Appellant contends that he "was a mere purchasing agent who obtained the

---

2. Masciale v. U. S., 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859.

3. Accardi v. U. S., 5 Cir., 257 F.2d 168.

4. Cratty v. U. S., 82 U.S.App.D.C. 236, 163 F.2d 844, 851.

5. See the discussions of Sherman and Sorrells in Accardi v. U. S., 257 F.2d 168, at page 172, Footnotes 4 and 5.

6. Sorrells v. U. S., 287 U.S. 435, at page 449, 53 S.Ct. at page 215.

narcotics with money supplied by the government informer at no profit to appellant and out of a sense of pity and sympathy for the said informer who claimed that he was 'sick' ".

■ This defense applies only to Counts 2 and 4 charging sales of heroin, and "the defense that" (Walker) was only a purchasing agent "does not apply" to the conviction on Counts 1 and 3 of receiving, concealing and facilitating the transportation and concealment of narcotics. Washington v. U. S., 275 F.2d 687, at page 690 and Coronado v. U. S., 5 Cir., 266 F.2d 719.

■■ There was ample evidence to raise an issue as to whether defendant was a mere conduit or purchasing agent, including testimony to the effect that defendant had made prior purchases and sales of narcotics, that he had knowledge of the narcotics trade, that he profited on the transactions in money or gasoline. Reasonable minds could have rejected defendant's testimony to the effect that he obtained the heroin for White because White did not have a car, since defendant did not use his car in the September 10 transaction, similarly they could have rejected defendant's excuse of sympathy for White because he was "sick", because defendant delivered the heroin to White during the noon hour as White "wanted to work". The Court submitted this defense exactly as requested in "Defense Request for Instructions No. 9". The District Court did not err in refusing to grant defendant's motion for acquittal on this ground. Washington v. U. S., supra. "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. U. S., 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; United States v.

Malfi, 264 F.2d 147, certiorari denied 361 U.S. 817, 80 S.Ct. 57, 4 L.Ed.2d 63.

### III.

With respect to the claimed error in failure to give defendant's requested instructions Nos. 2 through 11, Rule 30 of the Fed.Rules of Crim.Proc., 18 U. S.C., provides: "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto * * * stating *distinctly* the *matter* to which he objects and the *grounds* of his objection". In Marson v. U. S., 6 Cir., 203 F.2d 904, 912 the court states that "the purpose of Rule 30 was to give the trial court the opportunity to present the case to the jury with complete fairness to the parties and after full consideration of their claim as to their theories, the law, and the facts applicable", and declares that it is reversible error to refuse to present a requested "theory" supported by evidence to which the "court's attention is *particularly* directed * * *." Mims v. U. S., 9 Cir., 254 F.2d 654; Marbs v. U. S., 8 Cir., 250 F.2d 514; Northcraft v. U. S., 8 Cir., 271 F.2d 185; Estep v. U. S., 5 Cir., 223 F.2d 19. An examination of the charge below together with the refused requested instructions demonstrates that there is no error.

Defendant's requested instruction No. 9, which he says "went to the very heart of this case", was given in *haec verba*. His requested instruction No. 3 regarding sale and No. 10 regarding entrapment were not only included but more accurately stated in the Court's charge.

The theory and effect of defendant's requested instructions Nos. 2, 4, 5, 6, 7 and 11, to the extent not embraced in the Court's charge, is to "rob the statute" making possession of narcotics presumptive evidence of ultimate facts of guilt under Section 174 of Title 21 U.S.C.A.[7]

7. Title 21, Section 174 U.S.C.A., being Section 2(c) of the Narcotic Drugs Import and Export Act, 35 Stat. 614, as amended by the Act of November 2, 1951, 65 Stat. 767, provides in pertinent part as follows: "Whoever * * * receives, conceals, * * * or in any manner facilitates the transportation, concealment, or sale of any * * * narcotic drug after being imported or brought in, knowing the same to have been imported contrary to law, * * * shall be fined not more than $2,000 and

"of all efficacy". Manning v. U. S., 5 Cir., 1960, 274 F.2d 926, 930.

■ Direct evidence of defendant's possession of the heroin raised the statutory presumption of the existence of the essential facts of his violation of Title 21, Sec. 174, i. e. (1) that the heroin was received and concealed contrary to law, (2) that the heroin was imported contrary to law, and (3) that the defendant knew of the unlawful importation. Yee Hem v. U. S., 1925, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904; Corrollo v. Dutton, 5 Cir., 1933, 63 F.2d 7; Harris v. U. S., 1959, 359 U.S. 19, 79 S.Ct. 560, 3 L.Ed.2d 597; Manning v. U. S., 5 Cir., 1960, 274 F.2d 926.

Defendant contends that the presumption of guilt "disappeared" because (1) the government chemist testified that "it is possible" that heroin "may be" manufactured from morphine which has been synthetized within the United States, though he said "I do not know whether it has been done or not * * * but it is possible", and because (2) defendant testified that he did not know that the heroin was imported contrary to law. He insists that "since the approval by the Supreme Court of the constitutionality of said presumption, scientific progress in opium alkaloid chemistry has rendered the presumption invalid because as shown by this record heroin may now be manufactured from morphine which has been synthetized within the United States, and there is not now any rational connection between possession of the heroin and importation of the opium."

A similar contention was raised and rejected in Yee Hem v. United States, supra, Caudillo v. United States, 9 Cir., 1958, 253 F.2d 513, 518, certiorari denied Romero v. U. S., 357 U.S. 931, 78 S.Ct. 1375, 2 L.Ed.2d 1373, cited by this court in Manning v. United States, 5 Cir., 1960, 274 F.2d 926; and the presumption was applied in cases involving heroin in 1959

by the Supreme Court in Harris v. United States, 359 U.S. 19, 79 S.Ct. 560, 3 L.Ed.2d 597, and by the Second Circuit in 1960 in United States v. Cox, 277 F.2d 302.

In Yee Hem v. United States, supra, the Supreme Court stated [268 U.S. 178, 45 S.Ct. 471]:

"We think it is not an illogical inference that opium, found in this country more than 4 years (in the present case, more than 14 years) after its importation had been prohibited, was unlawfully imported. Nor do we think the further provision, that possession of such opium in the absence of a satisfactory explanation shall create a presumption of guilt, is 'so unreasonable as to be a purely arbitrary mandate.' By universal sentiment, and settled policy as evidenced by state and local legislation for more than half a century, opium is an illegitimate commodity, the use of which except as a medicinal agent, is rigidly condemned. Legitimate possession, unless for medicinal use, is so highly improbable that to say to any person who obtains the outlawed commodity, 'since you are bound to know that it cannot be brought into this country at all, except under regulation for medicinal use, you must, at your peril ascertain and be prepared to show the facts and circumstances which rebut, or tend to rebut, the natural inference of unlawful importation, or your knowledge of it,' is not such an unreasonable requirement as to cause it to fall outside the constitutional power of Congress."

In Caudillo the Ninth Circuit said [253 F.2d 518]:

"Finally, the Supreme Court has held that merely because it might be possible to legally import opium

---

imprisoned not less than two or more than five years * * *

"Whenever on trial for a violation of this subdivision the defendant is shown to have or to have had possession of the

narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

into this country, the presumption created by the legislature that allows the jury to draw an inference of illegal possession and knowledge of that illegality was valid. We can envision the *possibility* of opium poppies growing in this country, yet that fact will not cause us to declare § 174 unconstitutional."

Mr. Justice Clark's opinion in the Harris case notes that [359 U.S. 19, 79 S.Ct. 563]:

"The continuing purpose of Congress to wipe out the narcotics traffic is shown in § 201 of the Narcotic Control Act of 1956, 70 Stat. 572, 18 U.S.C. (1952 ed. Supp. V) § 1402, 18 U.S.C.A. § 1402, wholly outlawing any possession of heroin."

In Gore v. United States (1958—involving heroin), 357 U.S. 386, 389, 390, 78 S.Ct. 1280, 1283, 2 L.Ed.2d 1405, Mr. Justice Frankfurter refers to these laws "as means for dealing with a social evil as deleterious as it is difficult to combat", and adds "of course the various enactments by Congress extending over nearly half a century constitute a network of provisions, steadily tightened and enlarged, for grappling with a powerful, subtle and elusive enemy. If the legislation reveals anything, it reveals the determination of Congress to turn the screw of the criminal machinery—detection, prosecution and punishment—tighter and tighter."

In United States v. Feinberg, 7 Cir., 1941, 123 F.2d 425, 426, certiorari denied 315 U.S. 801, 62 S.Ct. 626, 86 L.Ed. 1201, where defendant testified, as he did here, that he did not know the narcotics were imported into the United States contrary to law, the court said:

"Counsel for defendant Ludwig insists that the record does not contain any evidence whatever of importation of the narcotics nor of any knowledge on the part of the defendant of such importation. He bases his argument upon the fact that Emma Ludwig testified that she did not know the drugs had been import-ed or where they had come from. We do not think the contention is tenable.

"In the instant case possession of the heroin was admitted by the defendant Ludwig and the proof showed that none of the exhibits bore United States Government Revenue Stamps as required for all narcotic drugs manufactured in the United States. The statute under which the indictment is found declares that when, on trial for a violation thereof, the defendant is shown to have, or to have had, possession of the narcotic drugs, such possession shall be deemed sufficient evidence to authorize a conviction unless defendant explains the possession to the satisfaction of the jury. By force of the statute, possession of narcotics give rise to an inference that the narcotics were imported contrary to law and a further inference that the person in possession had knowledge of such unlawful importation. True it is, a defendant on trial may overcome these inferences by satisfactory proof that in his case possession of narcotics did not involve a violation of the statute, either because the narcotics were not imported contrary to law or because he had no knowledge of unlawful importation. The explanation of possession, however, if it is to serve the defendant's purpose, must not only be believed by the jury but must also be one that shows a possession lawful under the statute. United States v. Moe Liss, 2 Cir., 105 F.2d 144; and Biegler v. United States, 7 Cir., 86 F.2d 41."

To the same effect are United States v. Cox, 2 Cir., 1960, 277 F.2d 302 (a case involving heroin) and Velasquez v. U. S., 10 Cir., 1957, 244 F.2d 416 (involving opium).

Even if the *statutory* presumption of violation of 21 U.S.C.A. § 174 arising from direct evidence of defendant's possession and sale of the heroin did not exist, where, as in the instant case, there

is a "rational connection between the facts proved and the ultimate fact presumed" and the presumption is "founded not only in probability, but in the strongest social policy", and the facts are likely to be much more provable by the defendant than by the government, the presumption of the ultimate facts of violation does not disappear or vanish "on the appearance of counter evidence."[8] In this situation the better rule is expressed in Caudillo v. United States, supra, stating:

> "As to Caudillo's second point (the defeat of the presumption as a matter of law), two failings exist: First, his evidence is by no means conclusive and unrebutted * * * Second, if his theory were accepted and a jury chose to disbelieve his evidence, there would be no evidence upon which they could find for the government; whereas if there were no evidence produced by a defendant, a jury could convict. In other words, he must take the position that unbelieved rebutting facts are sufficient to destroy an otherwise valid inference. McCormick in his work on Evidence, §§ 313–317, discusses this problem at great length and indicates that the better view taken by the cases (although there is no unanimity here) is that a valid inference remains even after there is rebutting evidence, either of the facts upon which the inference is based or those sought to be proved by it. The jury is entitled to consider it, and determine if, notwithstanding the rebutting evidence, the side relying on the inference has sustained his ultimate burden of proof."

8. McCormick on Evidence (1954) §§ 311–317, p. 652: " * * * The weight, greater or less, of the circumstantial inference from the proponent's facts, should be equally recognized as a part of the equation. The circumstantial force of these facts has not 'vanished' on the appearance of the counter-evidence * *. The problem will then be seen as one of assessing all the evidence and inferences, including the inference behind the pre-

And, aside from the statutory presumption of violation of Section 174 arising from the direct evidence of defendant's possession of heroin, the additional facts and circumstances introduced in evidence in this case constitute circumstantial evidence raising logical probative inferences that the ultimate facts of violation of Section 174 exist, as well as direct evidence of sales of narcotic drugs without order form in violation of Section 4705 of Title 26 U.S.C.

■ Defendant was convicted and sentenced generally, not for *one* offense but for *four*; the maximum sentence on one count is 40 years, and the minimum sentence on one count is 10 years, so that the defendant received the lightest possible sentence. It is fundamental that the judgment and "sentence will not be disturbed, even though there might be error in connection with one or more counts," just so long as it is valid as to any one of the counts. Estep v. U. S., 5 Cir., 223 F.2d 19, 21; Gore v. U. S., 100 U.S. App.D.C. 315, 244 F.2d 763, affirmed 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405.

■ Defendant's request for instruction No. 8 that the jury must be satisfied "to a moral certainty that defendant is guilty and in this connection you should take into consideration the character and conduct of each witness" etc. was properly refused because the Court repeatedly instructed the jury that defendant was presumed to be innocent, that "this presumption of innocence remains with him throughout the trial of the case and applies to the consideration of each of the essential ingredients going to make up the offense charged, and until you, the jury, are satisfied beyond a reasonable doubt from the evidence adduced by the prosecution on whom, as I said before, is

sumption, and including the discounting effect of any interest which a witness may have, to determine whether minds could reasonably differ as to the conclusion to be reached."

See also Rule 14(a) adopted by the National Conference of Commissioners on Uniform State Laws and Comment in 4 Jones on Evidence (4th Ed. 1958) pp. 1903–1906.

the burden of proof of the guilt of the defendant as charged", and that "you are the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given this testimony * * * you can accept as true or reject as false, in whole or in part, the testimony of each and every witness."

In Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150, the Supreme Court stated that: "if the jury is convinced beyond a reasonable doubt, we can require no more", and quotes from the opinion of Mr. Justice Woods in Miles v. United States, 103 U.S. 304, 312, 26 L.Ed. 481, to the effect that "attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." In Dunbar v. United States, 156 U.S. 185, 199, 15 S.Ct. 325, 330, 39 L.Ed. 390, the Supreme Court approved an instruction that "by a reasonable doubt you are not to understand that all doubt is to be excluded. It is impossible in the determination of these questions to be absolutely certain". With respect to the "moral certainty" charge McCormick on Evidence, p. 682 states: "It is an ancient maxim that all definitions are dangerous and this one has been caustically criticised as raising more questions than its answers and as giving an instrument to adroit defense counsel with which to play upon the fanciful doubts and exaggerated scruples of susceptible jurors."

The defendant's argument that the court should have given an instruction to the jury that the "informer" White's testimony "be scrutinized with special care" is without merit. Initially, the defendant did not specifically mention "informer" or request such an instruction, nor did he object to the charge given on this ground. When a proper request is clearly and specifically made and is not substantially covered in the charge it may be reversible error to refuse to give the charge. This court has so held in dealing with a specific request to caution the jury as to "accomplice" testimony. Phelps v. U. S., 5 Cir., 1958, 252 F.2d 49; Freed v. U. S., 49 App.D.C. 392, 266 F. 1012, 1017. But in those cases a specific request was made, and the charge considered as a whole was inadequate. Without a specific request or objection—the situation in the instant case—there is no reversible error. Northcraft v. U. S., 8 Cir., 271 F.2d 184, 185; Marbs v. U. S., 8 Cir., 250 F.2d 514; Mims v. U. S., 9 Cir., 254 F.2d 654; Johnson v. U. S., 81 U.S.App.D.C. 254, 157 F.2d 209; Estep v. U. S., 5 Cir., 223 F.2d 19; see Obery v. U. S., 95 U.S.App.D.C. 28, 217 F.2d 860. See also Siglar v. U. S., 5 Cir., 208 F.2d 865. Even defendant's own authority, Cratty v. U. S., 82 U.S. App.D.C. 236, 163 F.2d 844, 850 expressly holds that "in the absence of a request for an instruction on this subject, there is no reversible error." Defendant's authorities are further distinguishable from the instant case because in those cases "there was no corroboration of the informer's testimony." Cratty v. U. S., supra. In the instant case there was not only ample corroboration, but there was also no such requested instruction nor specific objection. The defendant was given broad latitude to prove credibility by cross examination and full opportunity to argue, and the issue of credibility was submitted to the jury with clear and careful instruction on their function as the sole judges of credibility.

The trial judge instructed the jury on every essential question in the case so as to properly advise it of the issues. The instructions contain definitions and explanations of the crimes charged in simple and accurate language. The judge read the pertinent portions of the statutes charged to have been violated which define the crimes and embody all the elements thereof in clear and explicit language.[9]

9. Title 21 U.S.C.A. § 174 is set out in Footnote Number 7 supra.

Title 26 U.S.C. § 4705(a) provides:
"It shall be unlawful for any person to sell, barter, exchange, or give away

In United States v. Malfi, 3 Cir., 1959, 264 F.2d 147, 151, certiorari denied 361 U.S. 817, 80 S.Ct. 57, 4 L.Ed.2d 63, it is stated "where an instruction described an offense 'in proper statutory language' and the 'primary law' was read 'We must assume that the jury was one of average intelligence * * * knew very well what was meant by the simple statutory words used to describe the offense * * and the instructions neither confused nor misled them,' " and "there was 'no merit in defendant's objections' to an instruction which 'simply quoted the * * * statute' ". To the same effect are Maynard v. U. S., 94 U.S.App.D.C. 347, 215 F.2d 336, 339 cited by this court in Thompson v. U. S., 5 Cir., 272 F.2d 919, 922, and 23 C.J.S. Criminal Law § 1190, pp. 732–733 and § 1194, pp. 742–743.

## IV.

■■■■ As to defendant's contention that he was denied due process of law because the trial judge, during the course of his argument, told counsel not to use the slang term "stool pigeon", suffice it to say that the court did not prevent counsel from making the most scathing and disparaging characterization of the informer, painting him as one whose testimony was not credible. The judge's statement only served as a repetition and emphasis of White's status as an informer. And no prejudice or harm to the defendant resulted from the trial judge's subsequently warning counsel against future use of these words as the record shows it was done "at the bench conference" after the jury proceeded to the back of the courtroom "out of hearing of the proceedings". Mr. Justice Frankfurter, in Johnson v. U. S., 333 U.S. 46, 54, 68 S.Ct. 391, 395, 92 L.Ed. 468 stated that "Federal judges are not referees at prize-fights but functionaries of justice. See Herron v. Southern Pacific Co., 283 U.S. 91, 95, 51 S.Ct. 383, 384, 75 L.Ed. 857; Quercia v. U. S., 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321." It is

not only within the province of the trial judge, but it is his duty to maintain decorum during the trial. See Henderson v. U. S., 6 Cir., 204 F.2d 126, Id., 6 Cir., 218 F.2d 14, 50 A.L.R.2d 754; United States v. Goodman, 7 Cir., 110 F. 2d 390, 394; Jones, Dignity in Our Courtrooms, 21 Ala.L. 193; Smith, Judicial Ethics and Courtroom Decorum, 27 Tenn.L.Rev. 26. Failure of the trial judge to sustain decorum has even been held to be reversible error. Shapiro v. Kilgore Cleaning and Storage Co., 108 Ohio App. 402, 156 N.E.2d 866.

Appellant's motions were properly overruled, the record contains no reversible error, and the judgment appealed from is affirmed.

---

narcotic drugs except in pursuance of a written order of the person to whom such article is sold, bartered, exchanged,

or given, on a form to be issued in blank for that purpose by the Secretary or his delegate."