Jack Marrin WILLIAMSON and Morris
Lee Lowrey, Appellants,

v.

UNITED STATES of America,
Appellee.

No. 19382.

United States Court of Appeals
Fifth Circuit.

Dec. 27, 1962.
Rehearing Denied March 5, 1963.

Cameron, Circuit Judge, dissented.

James P. Coleman, Ackerman, Miss., for appellants.

H. M. Ray, U. S. Atty., Alfred E. Moreton, III, Asst. U. S. Atty., Oxford, Miss., for appellee.

Before RIVES, CAMERON and BROWN, Circuit Judges.

RIVES, Circuit Judge.

Williamson and Lowrey were convicted of possessing 179 gallons of whiskey in unstamped containers in violation of section 5604(a) (1), Title 26, United States Code. Williamson was also convicted of carrying on the business of a wholesale liquor dealer and willfully failing to pay the special tax required by law in violation of Section 569(a), Title 26, United States Code. The specifications of error claim (1) unlawful entrapment, (2) prejudicial argument of the United States Attorney, and (3) insufficient evidence of identity of each of the defendants. There was clearly sufficient evidence of identity of the defendants. The claimed prejudicial argument of the United States Attorney need not be discussed because we think that the judgments must be reversed on the issue of entrapment.

The circumstances of the claimed unlawful entrapment were developed in the deposition of Robert Harris Moye, a Government informer, taken by agreement between the Government and the defendants on March 31, 1961, several months before the trial. Moye had been released from a federal prison on September 12, 1960 after serving three years for violating the Internal Revenue laws relating to whiskey. Within a few weeks after his release, he contacted two investigators for the Alcohol and Tobacco

Tax Division of the Treasury Department. Neither of these investigators testified as a witness in this case, and Moye's testimony as to the terms of his employment is not disputed. Because of its unusual nature, we quote at some length from Moye's deposition.

"MR. COLEMAN:

"Q. All right, now, sir, before we go into that, why did you call him, what was your reason for calling Mr. Rainer?

"A. Because I wanted to make some money, I had been in the penitentiary three years and not a bootlegger helped me one bit in the world and not a one of them paid me a nickel he owed me, or paid my wife.

"Q. So your proposal was that you would go to work for Mr. Rainer and them for pay?

"A. That's right.

"Q. Now then, did he come down and put you to work?

"A. He come down and Mr. Morris was the man that hired me.

"Q. But did Mr. Rainer come with him?

"A. Yes, sir, come down and introduced him.

"Q. How were they to pay you? Let me put it that way.

"A. How was he to pay?

"Q. Yes, sir, how were you to be paid, what was the agreement?

"A. I was to be paid $200.00 for Big Boy, $200.00 for James McBride, $100.00 for Hogie, he's Big Boy's half brother.

"Q. All right, sir.

"A. And $10.00 a day and my gas expenses.

"Q. You had a perfect right to make that trade with them, I'm just trying to get the facts about it. Now what I want to know is about when was that trade made, Mr. Moye?

"A. Well, I couldn't say.

"Q. Had you been home two weeks?

"A. It was a couple or three weeks.

"Q. After you came home?

"A. Yes, sir.

"Q. In any event, it was before Mr. Jack Williamson was arrested, wasn't it?

"A. Yes, sir.

"Q. What did you agree to do with Mr. Rainer and Mr. Morris? What did they tell you they wanted you to do?

"A. They told me to give them the major violators and told me what they'd pay for them.

"Q. For you to go out and catch them, in other words?

"A. If I could catch them.

"Q. And they agreed to pay you $200.00 as to Jack Williamson?

"A. Yes, sir.

"Q. You all called him Big Boy, I believe?

"A. Yes, sir.

"Q. And $100.00 as to his half brother, the Lowrey boy?

"A. Yes, sir.

"Q. When were they to pay you the money?

"A. Wasn't nothing said about when it was to be paid.

"Q. But in the meantime they would also pay you $10.00 per day to work as an undercover agent for them and for the government?

"A. That's right.

"Q. And they did pay you the $10.00 a day?

"A. Yes, sir.

"Q. After you had made this arrangement with Mr. Rainer and with Mr. Morris, was there any kind of a written agreement or anything on it?

"A. No, sir.

"Q. Just a verbal understanding with those two gentlemen?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Did you get the $200.00 that had been promised to you for catching Mr. Williamson?

"A. Yes, sir.

"Q. Did you get the $100.00 that was promised to you for catching the other boy?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. When was Jack Williamson's name first mentioned to you, Mr. Moye?

"A. When Mr. Rainer brought Mr. Morris to my house.

"Q. And who first mentioned his name?

"A. Mr. Rainer, I believe, told me, introduced us and says, 'He wants to talk to you about Big Boy Williamson,' says 'Do you know him, do you know Big Boy Williamson?' and I says, 'Yes', and he says, 'How well do you know him?' I says, 'Well, well enough,' so Mr. Morris started talking.

"Q. What did he say?

"A. Well, he just told me if I could catch him it would be $200.00, it would be $100.00 for Hogie, and $200.00 for little man, that's his twin brother."

A week or two later Moye traveled a distance of between 75 and 100 miles to Williamson's home. On Moye's first visit Williamson was not at home. Mrs. Williamson told Moye that her husband didn't have any whiskey. The following Sunday morning Moye returned with one Hubert Hocutt, a close friend of Williamson.

"A. I knew that Hubert knowed more about Big Boy than I did, and I knew if I carried Hubert there and Hubert told him that I was all right, that he was going to do business with me."

"A. I told him I wanted some whiskey, that I wasn't able to go in the woods, and I wasn't going in the woods any more for a while until I got in better shape than I was in, and he said he would have some and he would come to Greenwood and let me know, so he came and let me know and—

"Q. Just a minute now. What did he say about having any liquor on that particular occasion?

"A. Said he didn't have any.

\* \* \* \* \* \*

"Q. And then after you left there on Sunday, when did you next see Mr. Williamson?

"A. I believe it was on the next Friday, Thursday or Friday.

"Q. All right, sir, then what happened?

"A. Well, he come and told me he wouldn't pull less than 200 gallons, and I told him, I says, 'Well, I wanted 150, but I will take the 200.' And he says, 'Mr. Bob, you know I want my money when I deliver the stuff.' I says, 'I have got your money,' and I says, 'Let me know so that I can get the money out of the bank,' I says, 'I have been robbed once,' and he said he would do that, so he came to my house the night of the 14th—well, yes, the night of the 14th, but I would say it was about 2:00 o'clock.

"Q. Over in the morning of the 15th?

"A. Yes, sir. And he said, 'A highway patrol car is parked up the highway here,' and says 'I was scared to come by,' says 'I have got the whisky car stashed,' and he says, 'I want you to come go back by with me.' "

Moye and an investigator named Robert E. Lee, who was on undercover assignment, accompanied Williamson to a point where Williamson blew the horn of his car, whereupon Lowrey, drove from off the road a Mercury car loaded with 179 gallons of moonshine whisky. Lee "witnessed Bob Moye pay Jack Williamson $716.00 which I had given him earlier that night." Lee further testified:

"Q. \* \* \* After this payment took place, Mr. Lee, what, if anything did you do?

"A. Well, Jack Williamson carried Bob Moye and I back to the residence of Moye in Greenwood, and on the way back of course it was just talking and Jack Williamson made the statement in my presence, he turned to Bob and said, Uncle Bob, you going to have to know who you sell to. He said, they send somebody up to try to make a buy off of me every month."

On April 11, 1961, several months before the trial in September, the defendants' attorney, on the basis of Moye's deposition, requested the court to rule as a matter of law that the defendants had been entrapped. The court reserved its ruling and thereafter at the close of the evidence denied the defendants' motions for judgment of acquittal. The court ruled that no defense of entrapment could be presented for Lowrey, but submitted the issue of entrapment as to Williamson on a full and fair charge to which defendant's counsel made no objection.

Under the law of entrapment as developed in prior decisions of the Supreme Court [1] and of this Court,[2] no reversible error would appear except for the evidence of employment of the informer Moye on a contingent fee basis.

The uncontradicted and unexplained testimony as to the terms of Moye's employment make it necessary that the judgments of conviction be reversed. It may possibly be that the Government investigators had such certain knowledge that Williamson and Lowrey were engaged in illicit liquor dealings that they were justified in contracting with Moye on a contingent fee basis, $200.00 for Williamson and $100.00 for Lowrey, to produce the legally admissible evidence against each of them. It may be also that the investigators carefully instructed Moye on the rules against entrapment and had it clearly understood that Moye would not induce them to commit a crime, but would simply offer them an opportunity for a sale. None of these facts or circumstances were developed in the evidence, though Moye's deposition had been taken months before the trial.

 Without some such justification or explanation, we cannot sanction a contingent fee agreement to produce evidence against particular named defendants as to crimes not yet committed.[3] Such an arrangement might tend to a "frame up," or to cause an informer to induce or persuade innocent persons to commit crimes which they had no previous intent or purpose to commit. The opportunities for abuse are too obvious to require elaboration.

 No case has been cited by either of the parties involving a contingent fee agreement like that to which Moye testified, and we have found none. Under the principles settled in McNabb v. United States, 1943, 318 U.S. 332, 340, 63 S.Ct. 608, 87 L.Ed. 819, and its progeny,[4] however, it becomes the duty of the courts in federal criminal cases to require fair and lawful conduct from federal agents in the furnishing of evidence of crimes. Moye's testimony, standing alone and unexplained, discloses a form of employment of an informer which this Court cannot approve or sanction.

 Moye made the purchase from Williamson and produced the evidence

1. Sorrells v. United States, 1932, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413; Sherman v. United States, 1958, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848.

2. See Gargano v. United States, 5 Cir., 1928, 24 F.2d 625; Demos v. United States, 5 Cir., 1953, 205 F.2d 596; Accardi v. United States, 5 Cir., 1958, 257 F.2d 168; Suarez v. United States, 5 Cir., 309 F.2d 709.

3. The sale of the 179 gallons of moonshine whiskey occurred on October 15, 1960, some weeks after Moye's employment.

4. See Mitchell v. United States, 1944, 322 U.S. 65, 70, 71, 64 S.Ct. 896, 88 L.Ed. 1140; Upshaw v. United States, 1948, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100; Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

against both Williamson and Lowrey. For such services the Government agents paid Moye as to Williamson $200.00, and as to Lowrey $100.00. McNabb, supra, and its progeny clearly forbid the Government to make use of the fruits of wrongdoing by its officers or agents.

Moye's deposition standing alone furnishes prima facie evidence of wrongdoing on the part of the Government investigators in employing Moye on a contingent fee basis. Lacking any contradiction, justification or explanation of such a basis of employment, the convictions of the defendants resulting from Moye's services cannot be sustained. The judgments are therefore reversed and the cases remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

JOHN R. BROWN, Circuit Judge (concurring specially).

I concur in the result and in the Court's opinion. And it is evident that I agree with much that is said in the dissent.

I do not think, however, that this is an aspect of entrapment. Its kinship to entrapment is not that the act of a Government representative induced the commission of a crime. Rather, it is that the means used to "make" the case are essentially revolting to an ordered society.

For Government to offer a specific sum of money to convict a specified suspect is really more than civilized sensibilities can stand. But in condemning such conduct by the decisive weapon of a reversal, we ought to be aware that there may be equally offensive actions which are less spectacular.

Thus, as the dissent emphasizes so well, the "contingent fee" for a narcotics addict hardly needs to be spelled out in the terms used to trap this moonshiner. To get the stuff to feed his uncontrollable appetite, he knows that he must produce results or he will no longer be "hired" as one euphemistically referred to as a "special employee" but who are better known in the literature of crime as stool pigeons. The pressures which this insatiable appetite generates require that the rights of an accused be carefully protected lest an innocent person become the victim of the "contingent" informer's overpowering physical dependence on the availability of drugs. This may well require inquiry into the methods used, the circumstances under which an addicted informer is utilized, the nature of the instructions given, the standards laid down to test the sufficiency of his performance upon which his reward is to be based, or the like.

What we hold is that, recognized as is the role of informer in the enforcement of criminal laws, there comes a time when enough is more than enough— it is just too much. When that occurs, the law must condemn it as offensive whether the method used is refined or crude, subtle or spectacular.

CAMERON, Circuit Judge (dissenting).

I agree with the contention of the United States here that the evidence does not tend to establish entrapment as that term has been usually accepted by this Court. Cf. Accardi v. United States, 1958, 5 Cir., 257 F.2d 168, 172; Vamvas v. United States, 1926, 5 Cir., 13 F.2d 347, 348; and Park v. United States, 1960, 5 Cir., 283 F.2d 253, 254. What we said in the last mentioned case sums up the rule recognized by this Court: "Nothing here established that the agents lured and induced the commission of the offense rather than affording an opportunity to persons of ready willingness and complaisance to enter into the unlawful transaction."

The majority, in reality, reverses this case because of the ignoble part assigned by the Government to the informer Moye. The sole basis of the reversal is that Moye was working on a contingent fee

basis.[1] He was paid a nominal salary and furnished gasoline and was to receive $200.00 if he made a purchase from one of these defendants leading to his conviction and $100.00 if he made a like purchase from the other.

In the majority's view, the very fact of hiring an informer on a contingency is ignoble. Such a holding would rob the Government of one of its most effective weapons in detecting crime and bringing to the bar of justice those who commit it.

For decades the use of informers has been accepted as a proper means of enforcement of the criminal law. It is recognized by all as one of the most important means. And, in practically all instances, the informer is in reality on a contingent basis.

The method chiefly used in apprehending sellers of narcotics, for instance, is the employment of addicts to make the purchases from suspects in the presence of federal officers who are secreted or in disguise. Every such informer knows that his day to day arrangement with the Government will continue only if he delivers the goods. The addict is given barely enough money to live on and supply his need for narcotics for a few days. In most cases, the Government agents are after one or more individuals to whom the informer is sent. If the addict succeeds in landing some of the criminals the Government is after, he is well paid and his services will continue. If he does not, he is dropped. As far as I know, the courts have accepted such practices as permissible. The same attitude has prevailed in connection with informers in the apprehension of liquor law violators.

Those who represent persons charged with crime have for ages made impassioned pleas—mostly to juries—that the hiring of informers, in many cases friends of the victims being sought, is dirty business. Crime itself is dirty business, and the universal experience of law enforcement officers is that the use of informers is necessary to the enforcement of law.

Not only the court but the Congress has put its stamp of approval, under conditions like those present here, on the employment of informers in the enforcement of the Internal Revenue Laws. Cf. Internal Revenue Code, 1954, § 7623. It is common knowledge that, based upon that statute, those charged with the responsibility of collecting the government revenues make it a practice of rewarding, contingently, individuals who "squeal" on those from whom sums are collected through information furnished by the "squealer." It is commonly accepted that the one who informs is given ten percent of the take. By § 7214(a) of the Code, the discretion is given to a court imposing sentence on a revenue agent or employee convicted as the result of 'information furnished by an informer, to award the informer a portion of the fine imposed not in excess of one-half thereof.

At a time when crime of all sorts is so definitely on the increase, I am not willing to weaken the hand of the law by interfering with a practice as well established as the one here under examination. Juries generally take into account the interest of every witness who testifies before them. What we are really dealing with here is the weight of the testimony of an interested witness employed as an informer. The juries can be counted upon to make proper discount in crediting the testimony of an informer employed on a contingent basis. It is their function to determine the extent of the discount. I do not think we ought to take such a witness off of the stand entirely. I respectfully dissent.

Rehearing denied; CAMERON, Circuit Judge, dissenting.

1. The basis for the reversal which the majority apparently accept is thus stated in the appellants' brief:

"We respectfully urge that all entrapments accomplished by an informer working for a contingent financial fee should be outlawed as being incurably afoul of public policy and not to be permitted under our form of government."