UNITED STATES of America, Plaintiff,

v.

**Harry HASTINGS, Jr., Paul Hastings and Toney Givens, Defendants.**

UNITED STATES of America, Plaintiff,

v.

**Harry HASTINGS, Sr., Toney Lynn Givens and Gary Wayne Smith, Defendants.**

**Nos. LR–75–CR–242 and LR–76–CR–18.**

United States District Court,
E. D. Arkansas, W. D.

Aug. 23, 1977.

W. H. Dillahunty, U. S. Atty., Walter G. Riddick, Jr., Asst. U. S. Atty., Little Rock, Ark., for plaintiff.

House, Holmes & Jewell, and Jack L. Lessenberry, Little Rock, Ark., for Harry Hastings, Jr., Paul Hastings, and Harry Hastings, Sr.

L. Gene Worsham, Little Rock, Ark., for Toney Givens and Gary Wayne Smith.

## MEMORANDUM OPINION

SHELL, District Judge.

These criminal cases present novel questions concerning the responsibilities of this Court to supervise terminations of prosecutions sought pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure. The United States Department of Justice seeks dismissal *simpliciter* of two federal indictments on the basis of its conclusion that local law enforcement tactics employed in the. apprehension of these defendants are inimical to the concept of fundamental fairness guaranteed by the Fifth Amendment to the United States Constitution. In what appears to be a question of first impression this Court is called upon to determine to what extent Rule 48(a) contemplates that the Attorney General must support his legal conclusion that prosecution of these defendants would be fundamentally unfair.

Five persons are charged in these two indictments. Each indictment contains multiple counts. In case number LR–75–CR–242, Count I charges that Toney Givens transported in interstate commerce an air compressor having a value in excess of $5,000.00, knowing same to have been stolen, in violation of 18 U.S.C. § 2314. Count II charges Harry Hastings, Jr. and Paul Hastings with receiving the same air compressor, with knowledge that it was stolen, in violation of 18 U.S.C. § 2315. The indictment in case number LR–76–CR–18 contains three counts. Count I charges that Harry Hastings, Sr., Toney Givens and Gary Smith conspired to violate 18 U.S.C. § 659 by stealing, receiving, and possessing a truckload of tires which constituted an interstate shipment of freight, all in violation of 18 U.S.C. § 371, the federal conspiracy statute. Count II charges Gary Smith and Toney Givens with transporting in interstate commerce the same shipment of tires, in violation of 18 U.S.C. § 2314. Count III charges that Harry Hastings, Sr., received the shipment of tires, knowing that it had been stolen, in violation of 18 U.S.C. § 659.

▇▇ In pertinent part, Rule 48(a) simply provides that "[t]he Attorney General or the United States Attorney may *by leave of Court* file a dismissal of an indictment . . . and the prosecution shall thereupon terminate."[1] It is not surprising that the Rule provides the Court with no criteria to guide it in the exercise of its discretion. In each instance application of the Rule touches the sensitive constitutional subject of the Doctrine of Separation of Powers, which does not lend itself to easy answers. On the one hand the Executive is granted a broad discretionary power to control federal criminal prosecutions under the directives of Article II, Section 3 that the President shall "take Care that the Laws be faithfully executed." Accordingly, the Executive fulfills the role as the absolute judge of whether a prosecution should be initiated and the first and presumptively the best judge of whether a pending prosecution should be terminated. *United States v. Cowan,* 524 F.2d 504, 513 (1975). On the other hand it is the primary responsibility of the Judiciary under Article III to protect the public interest in the fair administration of criminal justice. *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The Judiciary, with the Supreme Court at its head, is the ultimate interpreter of the Constitution. *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and although the execution of the federal laws under our Constitution is primarily the duty of the executive branch, the actions of the Executive are clearly subject to constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations.

Rule 48(a) by its terms contemplates the interplay of powers of the Executive and Judiciary. Prior to the passage of the Federal Rules of Criminal Procedure, the President's duty to take care in the faithful execution of the laws was commonly cited to support the practice of dismissing charges without judicial review. Promulgation of Rule 48(a) bridled this practice. The conditioning of dismissals upon leave of Court serves to check the potential for prosecutorial abuse inherent in unreviewable dismissals. The Rule, however, was not intended to act as a stalemate provision. As aptly stated in *Youngstown Sheet & Tube v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153, the Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity." The genius of American government stems, of course, from the sovereignty of the people. The mechanics of our republican form of government, however, depends not upon the distribution of power but upon the synchronization of power. The difficult task is to achieve by means of judicial review the synchronization of powers true to the essential functions of each branch. This Court approaches this sensitive issue with extreme caution because "[f]ew subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding . . . whether to dismiss a proceeding once brought." *Newman v. United States,* 127 U.S.App.D.C. 263, 264, 382 F.2d 479, 480 (1967).

▇▇ Despite the paucity of case law in this area a few precedents seem quite clear. There is little question that this Court can reject the government's motion to dismiss charges if it is satisfied that the dismissal is sought in bad faith. *United States v. Greater Blouse Skirt & Neckwear Contractor's Ass'n,* 228 F.Supp. 483 (1964). A motion to dismiss stemming from collusion between the prosecutor and the accused falls within this category. Likewise, dismissals sought on grounds far afield of the law or facts, even though innocently motivated,

---

1. Appended to the motions to dismiss these indictments filed by the United States Department of Justice was a letter of transmittal from the United States Attorney for the Eastern District of Arkansas protesting dismissal. This Court will not be engaged in a dispute between the Attorney General and the United States Attorney for the Eastern District of Arkansas who serves at the direction of the Attorney General. It is the Attorney General who has primary authority over this prosecution. Insofar as this proceeding is concerned, the Court will look only to the Attorney General as the representative of the United States.

would warrant this Court's disapproval.[2] *United States v. Bettinger Corp.* 54 F.R.D. 40 (1971); *United States v. Doe,* 101 F.Supp. 609, 611 (1951). On the other hand, in deference to the primary responsibility of the executive branch to supervise prosecutions, it is generally held that dismissal is warranted if the Court is satisfied that the reasons advanced for dismissal are substantial, supported by a factual basis and are compatible with the public interest. *Greater Blouse, supra.* In *United States v. Ammidown,* 497 F.2d 615, 622 (1973), the Court of Appeals for the District of Columbia ruled that a district court was not free to withhold its approval of dismissal unless it was prepared to rule that the actions of the government constituted "such a departure from sound prosecutorial principle as to mark it an abuse of prosecutorial discretion."

Nothing before this Court suggests that the Attorney General has acted in bad faith in requesting dismissal of these charges. In his memorandum in support of the motions, the Attorney General has represented that his conclusions are based solely upon the legal judgment of his office. Thus, court approval of dismissal in these cases depends entirely upon a review of the legal conclusions of the Attorney General in light of the facts which have been developed.

The conclusion reached by the Department of Justice is that the conduct of local law enforcement agents in apprehending these defendants was so outrageous that principles of due process bar invoking judicial processes to obtain convictions. It is clearly not the position of the government that these defendants have asserted a meritorious defense of entrapment, which is conditioned entirely upon an accused's innocent predisposition. *Hampton aka Byers v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1975); *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). The government argues that members of the Organized Crime and Intelligence Unit of the Little Rock Police Department overstepped the bounds of constitutionally permissible police activity in their zeal to prosecute these defendants. The government deems further prosecution under these circumstances repugnant to the principles of fundamental fairness.

On February 20, 1976 this Court conducted a lengthy hearing on motions filed by the defendants in this case seeking dismissal of the indictments on identical grounds relied upon by the government. A brief review of the facts gleaned from the evidence presented at the hearing is required.

The central figures in the investigation and apprehension of these defendants were Rayburn W. Hamilton and Lt. Forrest Parkman, the command officer of the Organized Crime and Intelligence Unit of the Little Rock Police Department. On November 19, 1975, Lt. Parkman obtained Hamilton's release from the Little Rock Jail, where Hamilton had been detained awaiting disposition of numerous criminal charges lodged against him.[3] Once in Parkman's employ Hamilton was assigned only two undercover projects. One project was

---

**2.** In most instances where dismissal is refused on grounds of an erroneous view of the law or misrepresentation of the facts, it appears that the refusal is bottomed on the same considerations preventing dismissal stemming from collusion. The spectre of irrationality raises a distinct suspicion of collusion.

**3.** When released, Hamilton was awaiting disposition of State charges of false pretense in both Benton and Pulaski Counties. Warrants for his arrest were outstanding on grounds of suspected parole violation and non-payment of fines in North Little Rock Municipal Court. In addition, Hamilton was wanted for questioning by the Pulaski County Sheriff on suspicion of assault with intent to kill. Hamilton testified that on the day of his release he telephoned the Organized Crime and Intelligence Unit to say that he was "hung up" and wanted out. The exact circumstances of his release were not fully explained, yet five minutes after he was released Hamilton appeared in Parkman's office. On November 25, 1975, the officer-in-charge of detention on November 19, B. R. Keys, received a letter from then-jailer Lt. Sonny Simpson officially reprimanding Keys for Hamilton's release. The letter mentioned "untold expense to the public" and the potential "danger to the lives of police officers" involved in relocating and apprehending Hamilton.

to attempt to purchase narcotics from John Wilkins, which proved unsuccessful. The second project was to sell stolen merchandise to Harry Hastings, Sr., which resulted in these indictments. Although the scope of police investigation is rarely a matter for judicial review, it is significant to the Court's understanding of the background of this case that Hamilton's activities were restricted by Parkman to the investigation of these two individuals. Both John Wilkins and Harry Hastings, Sr. were defendants in a civil suit brought by Parkman alleging defamation which was dismissed in defendants' favor in late May 1975.[4] It is clear to this Court in light of the surrounding circumstances that the two investigations conducted by Hamilton at the behest of Parkman were motivated by Parkman's desire for vengeance against Wilkins and Harry Hastings, Sr. stemming from the dismissal of Parkman's civil suit.

Immediately after his release from jail Rayburn Hamilton was provided a rented automobile,[5] credit cards under an assumed name, and a liberal amount of spending money[6] by the Organized Crime and Intelligence Unit of the Little Rock Police Department. Equipped with a tape recorder and a body microphone Hamilton began negotiations with Harry Hastings, Jr. on or about November 20, 1975 concerning the purchase of an air compressor. It is unclear with whom Hamilton dealt concerning the purchase of a truckload of tires, but it was established that a deal was struck on or about that time to deliver a shipment of tires to Harry Hastings, Sr. Between the dates of November 20 and November 23

Hamilton was informed by Parkman that the "theft" of these two items could be arranged to take place across state lines through the cooperation of law enforcement officials in Texas and Mississippi. In the interim Hamilton obtained the assistance of two recruits, Toney Givens and Gary Smith. Financed by the Little Rock Police Department, Givens, Smith, and Hamilton ventured to Texarkana, Texas in a rented car and truck and returned with an air compressor "stolen" from the parking lot of a Texas business. Unknown to Smith and Givens, Hamilton was in frequent contact with Parkman and the intelligence unit of the Texarkana, Texas police force for the duration of the trip. The situs of the "theft" of the air compressor was arranged by Texas authorities. Upon his arrival in Texarkana Hamilton split with Givens and Smith, met with Texas and Little Rock police officers and was directed by them to the location of the compressor. The taking of the air compressor occurred that night under the watchful eye and protection of both Texas and Little Rock police officers. The compressor was delivered to Harry Hastings, Jr. and Paul Hastings on November 25. Paul Hastings and Harry Hastings, Jr. chipped in together to pay the purchase price of one thousand dollars in hundred dollar bills. Hamilton testified that he informed them that the compressor was stolen when the money was paid.

On November 24, 1975, Smith, Givens and Hamilton ventured to Senatobia, Mississippi on a similar mission. With the cooperation of Parkman, the Mississippi Highway Patrol, the Attorney General's Office of the

---

**4.** In an action styled *Forrest Parkman v. Harry Hastings, Sr., Cecil Hill, Sr., John Wilkins, and Gail Ferguson*, case number 75–448, filed in the Circuit Court of Pulaski County on January 29, 1975, Parkman alleged that the above-named individuals, acting in concert, maliciously accused him of raping two women. Parkman sought $1,025,000.00 in damages. The complaint was dismissed with prejudice on May 20, 1975 in Circuit Court. The judgment of dismissal was affirmed on appeal to the Arkansas Supreme Court on January 12, 1976.

**5.** Financed by the L.R.P.D. Hamilton rented a Mustang II automobile under an assumed name

from Thrifty Rent-A-Car on November 20, 1975. On November 26, 1975 Thrifty recovered the car after notification by a Little Rock towing company that it was available for return. On December 16 Thrifty was paid $197.44 to cover the cost of repairing the windshield and back seat. It was apparent that the holes in the windshield and back seat were caused by a bullet.

**6.** The testimony was that Hamilton was paid almost $3,100 during a thirty-day period from early November to early December 1975.

State of Mississippi, and the Armstrong Rubber Company, Hamilton directed Givens and Smith in the taking of a truckload of tires. On cue from the Mississippi Highway Patrol and Little Rock police the truck driver left the motor running in his vehicle while visiting a truckstop, thereby permitting the taking. These tires were later delivered to Harry Hastings, Sr. Hamilton testified that Mr. Hastings, Sr. knew that they were stolen.

Lt. Parkman freely admitted to this Court that this case was intended by the Little Rock Police Department to be a federal case from the beginning. In addition, Rayburn Hamilton verified his recorded statements made during one of the trips which expressed the belief that transporting these items of personal property across state lines meant that "that old federal man's all with us now." The truth of the matter is that the Federal Bureau of Investigation was not consulted when these schemes were concocted and later carried out by the Little Rock Police Department. The record reveals that the F.B.I. was first called to participate in this case on November 24, 1975 for purposes of executing a federal search warrant after delivery of both items had been arranged.

The Supreme Court of the United States has steadfastly refused to rule that government participation in crime necessarily bars conviction of its participants. *United States v. Archer,* 486 F.2d 670, 675 (1973). A majority of the sitting Justices, however, have indicated that police misconduct, standing alone, may be so outrageous that further prosecution is foreclosed. *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1975).[7] Where the line between permissible and impermissible police conduct is to be drawn is hard to figure

and even more difficult to express. There simply are no sharply defined standards in this area.

In *United States v. Archer, supra,* decided on other issues, the esteemed Circuit Judge Henry J. Friendly covered the ground for all that it's worth leading up to the more recent decision in *Hampton.* As Judge Friendly points out, the most celebrated passage called to mind in this area is the dissenting opinion of Justice Brandeis in *Olmstead v. United States,* 227 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) in which Justices Holmes and Stone joined:

"Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face."

Although the views of Justice Brandeis have not been generally accepted, shreds of his thoughts have been grafted on the law. In *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), principles of fundamental fairness were invoked to bar

---

7. Justices Rehnquist and White and The Chief Justice adhere to the view that principles of fundamental fairness come into play "only when the Government activity in question violates some protected right of the *defendant,*" and moreover, only when there is no evidence of predisposition. *Hampton,* at 490, 96 S.Ct. at 1650. Justices Blackmun and Powell eschew the foregoing hardfast rule in favor of a more flexible approach preserving the power of the

Court to bar conviction when outrageous police conduct is shown, regardless of the predisposition of the accused or the absence of a denial of a specific right of the accused. Justices Brennan, Marshall, and Stewart concur in Powell's view yet they would go further by fashioning a rule barring conviction as a matter of law where the subject of the criminal charge is contraband provided by the government.

prosecution of a defendant who was subjected to the warrantless extraction of his stomach's contents. Cf., *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). In *Williamson v. United States*, 311 F.2d 441 (1962), a case where the government employed a narcotics informant on a contingent fee basis, Judge Brown wrote: "What we hold is that, recognized as is the role of the informer in the enforcement of criminal laws, there comes a time when enough is enough—it is just too much."

This Court does not share the pride of the Organized Crime and Intelligence Unit in the means employed in apprehending these defendants. Notwithstanding the predisposition of these individuals to criminal ways, it is obvious that they became victims of selective enforcement of the laws due to Parkman's vendetta with John Wilkins and Harry Hastings, Sr. It also appears that the creative activity of the local police in these criminal schemes coincided exactly with the beginning and the end of the events which gave rise to the charges against these defendants. Unlike the usual case where the informant merely provides something of value to gain introduction to on-going criminal activities, the procurement of the contraband necessary for bringing these charges was made possible only through the efforts of the police. In the eyes of this Court the terms of employment of Rayburn Hamilton in service to Parkman were not unlike those condemned in the celebrated "contingent fee informer case." Part of the price paid to Hamilton upon delivery of these goods was retained by him as a fee for his services. As Judge Rives stated in *Williamson, supra*, "the opportunities for abuse [under such terms] are too obvious to require elaboration." 311 F.2d 441, 444. These terms of employment also suggest to the Court that Hamilton's intent was highly suspect. Moreover, the necessary federal element of these proceedings, an interstate nexus, was the device of the police themselves.

■ This Court stated at the outset that these cases presented novel questions concerning its responsibilities to supervise terminations of prosecutions under Rule 48(a). The fact that the Attorney General seeks dismissal of these charges on the basis of his legal conclusions sets these cases apart from any on record. A stricter standard of scrutiny is certainly required. However, this Court cannot lose sight of the objectives of Rule 48(a). The Rule seeks to achieve the synchronization of powers true to the essential functions of both the Judiciary and the Executive. The Department of Justice has simply asked that it not be forced to present to a jury evidence obtained by law enforcement practices it does not condone. On the basis of the evidence before it, this Court is satisfied that the reasons advanced for dismissal are substantial and that they have a basis in fact. The conduct of Lt. Forrest Parkman and the members of the Organized Crime and Intelligence Unit in the investigation and apprehension of these individuals was egregious, if not outrageous. In the opinion of the Court it is not an abuse of the prosecutorial function for the Department of Justice to adhere to reasonable standards regulating permissible police participation in criminal activity. The public interest surely will be well served by this practice. Therefore, this Court will not disturb the considered judgment of the Attorney General. The motion on behalf of the United States to dismiss those indictments will be granted. An appropriate order will follow.