### UNITED STATES of America

v.

### James D. BARESH, William E. Satterwhite, Jr., Ben Snyder, Jesus Vasquez.

### Crim. No. H–83–191.

United States District Court, S.D. Texas, Houston Division.

Oct. 23, 1984.

Gordon M.S. Young, Paul Coselli, Asst. U.S. Attys., S.D. Tex., Houston, Tex., for plaintiff.

Michael Ramsey, William M. Thursland, William E. Satterwhite, Jr., Wendell Odom, Jr., Kent A. Schaffer, Houston, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

DeANDA, District Judge.

Claiming constitutional violations, including a denial of due process, Defendant William E. Satterwhite, Jr. has filed a motion for acquittal. The motion is predicated on his contention that a plea bargain agreement between the prosecution and the co-conspirator witness Cesar Quiroga so tainted Quiroga's testimony as to result in the denial of a fair trial.

*The Prelude*

In February, 1982, Cesar Quiroga and several confederates were arrested by state officers while they were engaged in unloading several thousand pounds of marijuana from a vessel at or near Baytown, Texas. Faced with the inevitable prospect of a minimum penal term of 15 years and a massive fine, Quiroga and his attorney engaged in plea negotiations with the Harris County District Attorney's Office and state drug enforcement officers.

*The Quid Pro Quo*

There followed preliminary discussions between the attorneys during which defense counsel apparently disclosed the nature of the information her client might provide. Assistant District Attorney (Mr. Ted Wilson) made known his desire to prosecute the Defendants Jorge Ubeda and Satterwhite, as well as his assessment that Quiroga's assistance in making a case against Satterwhite would be sparse.[1]

---

1. Wilson: "The best I can understand from talking to Ms. Akins is that it appears that you are fairly comfortable that you can do Jorge Ubeda, that you can give the information that's going to wrap up Jorge Ubeda ... however, Bill Satterwhite, you may or you may not be able to do him."

An agreement was made that Quiroga would cooperate with the state. By its written and oral terms, Quiroga was to provide evidence against these Defendants both as to past acts and contemplated future transactions.

Conditioned upon Quiroga's truthful information and testimony being sufficient to bring about the arrest and indictment of these specific Defendants, among others, on aggravated controlled substance violations, either state or federal, the prosecution was committed to dismiss the pending state indictment and immunize Quiroga from any subsequently disclosed narcotics violations. Further, there would be no fines or forfeitures of any assets owned by Quiroga and obtained with narcotic profits; and he would not be required to testify against his cohorts in the pending state case.[2] But the government's generosity did not end here. According to Quiroga's testimony, the prosecution reduced his bond and permitted him to use property owned by him (and now secure from seizure) as collateral on the bond. Thereaft-er, when it was necessary for Quiroga to refinance this property, the government further accommodated him by releasing the prior lien it held on the property.

In a subsequent agreement dated June 29, 1983, the same parties were joined by federal authorities. Its substance is the same as the earlier one except that the seven-year contingency for "doing" Ubeda (but not Satterwhite) was omitted.[3]

It is clear that Quiroga's plea bargain agreements were contingent upon the production of information and testimony about past and future criminal activities which would result in the indictment of both Satterwhite and Ubeda. If Quiroga told the truth, the whole truth and nothing but the truth but it did not result in indictments against these Defendants, the case pending against him in state court would not be dismissed and the collateral benefits he received would disappear as well. Finally, the agreement contemplated Quiroga's testimony at trial as a condition to dismissal of the charges against him.[4]

2. Exhibit D(B)5, the written agreement dated May 28, 1982; and Wilson's oral statement (tape transcript). In substance Wilson told Quiroga that he, Wilson, had already cleared the offer with the district attorney and that "if you are able to provide information and the assistance that results in the arrest and indictment of Jorge Ubeda and Bill Satterwhite ... if we get an arrest and indictment of Ubeda and Bill Satterwhite, for any aggravated controlled substance offense, I don't care if it's cocaine or marijuana, then Mr. Holmes has authorized me to dismiss your case. Like you never got in any trouble." Mr. Wilson further stated, "If your assistance and if the information that you give these officers results in the arrest and indictment of Jorge Ubeda, and the seizure of a large shipment of marijuana coming in on a boat, but you can't do Bill Satterwhite, I don't care how hard you work at it, and everything, but for one reason or another we cannot arrest or indict him for anything, then what I have told Ms. Akins and what I'm telling you is that you are starting at 15 years in the pen (and the things that you are charged with, if you are found guilty, then the least you can get is 15 years in the penitentiary, the most you can get is 99 or life). I will plead you for seven years which is half of what the minimum would be..."
After making it clear that the agreement applied either to a state or federal case, Mr. Wilson continued "federal laws are a little bit different than state laws. In federal laws some times you can indict some one without having all of the evidence that you might need in a state case but I'm not an expert on federal law, I'm not a federal prosecutor ... frankly I prefer to indict him in state court, Satterwhite, no question about that. But if I can't, and if you have got the information and taking what you have done for these guys coupled with some things you know, there is enough there to where they can indict him in federal."
When Quiroga's lawyer voiced concern that her client's property might be seized under drug forfeiture laws Wilson assuaged Quiroga's fears by stating "if he owns a hotel on Miami Beach that he got by dealing drugs, we are not going to forfeit the hotel."

3. Exhibit D(B)6.

4. Again quoting Mr. Wilson: "... then after you testify or even once they are arrested and indicted you are going to be alright. You don't need to worry about your case any more. But you are going to have to testify, and I can tell you right now what I would do with your case. I wouldn't dismiss your case until you finished testifying. It is my guarantee that you are going to show up in court and be the witness in this thing."
Making reference to that part of the plan dealing with future narcotics deals and the possibili-

*The Harvest Reaped*

On November 28, 1983, Satterwhite was indicted by a federal grand jury on various charges of conspiracy and substantive offenses constituting violations of the controlled substances act relating to marijuana.

Quiroga testified before that grand jury and subsequently in this trial that he had met Satterwhite in May, 1980 in Houston. He claims that he and Satterwhite transported 11 Cubans recruited by Quiroga in Miami to offload marijuana and that he and Satterwhite transported the workers to the unloading site. Since Quiroga was not familiar with the location, Satterwhite drove the lead vehicle. He states that Satterwhite remained at the unloading site while the marijuana was transferred from boat to trucks. According to Quiroga, he and his crew received only partial payment for that night's work and in an effort to contact Ubeda for payment of the balance of the money due him, Quiroga contacted Satterwhite by phone and in person on several occasions over a period of several months. He stated that he made several trips to Houston by plane. On one occasion he was accompanied by five members of his underpaid crew. He named the motel at which he stayed during these visits. He rented cars and on more than one occasion talked to the secretarial staff at Satterwhite's office. Finally, his efforts were rewarded when Satterwhite paid him $25,000 by a cashier's check as partial payment on the amount owed.

On the record before this Court, there was never any mention by Quiroga of Satterwhite's involvement in these events to any state or federal authority prior to his grand jury testimony in 1983.

The government has diligently and efficiently documented much of the testimony of other co-conspirators with motel invoices and registration cards, with documentary evidence of lease, purchase and rental transactions, with invoices, telephone records, bank records, and unimpeached witnesses. Yet Quiroga's devastating testimony against Satterwhite stands alone. He denied knowing even the names of the men he had recruited in Florida and who accompanied him to Houston on more than one occasion. This testimony was patently false. It deprived Satterwhite of an opportunity to refute the charge. No one was called to testify from Satterwhite's office to corroborate Quiroga's testimony that he had been there; no explanation for this failure was made. No documentation was produced to corroborate the payment by cashier's check. No car rental agreements were produced. No telephone records were offered. No motel records were shown. Having observed the astuteness and industry of government counsel in corroborating other co-conspirators' testimony, the Court can only conclude that the documentation does not exist.

It is apparent from this record that the largess of the prosecution's benevolence to Quiroga placed far more stress upon his veracity (though buttressed by the government's requirement of truthfulness) than its gossamer frailness could withstand.

In the recent case of *United States v. Waterman*, 732 F.2d 1527 (8th Cir., 1984), a contingent agreement with the government's key witness similar to the one at issue was held to violate due process. The substance of the agreement was that if the witness's testimony led to indictments of certain individuals, the government would recommend a substantial reduction in the witness's sentence, but if the testimony did not result in these indictments, no reduction would be recommended, irrespective of the truthfulness of the evidence. Subsequent to his conviction, predicated in part on this evidence, Waterman questioned the constitutionality of this arrangement on 5th and 6th Amendment grounds of denial

ty of catching the targets "red handed with the dope" Wilson continues, "but if it doesn't work that way we may need you to testify before a grand jury and we may need you to testify before a trial court. That will be in the agreement. It will be part of your requirements, that you will have to do those things before I will do what I say I am going to do, which is dismiss your case."

of due process and entitlement to fair criminal proceedings. The precise issue before the *Waterman* Court was whether an agreement to procure testimony about accomplished facts, which places a premium on testimony adverse to a defendant, creates a risk of perjury so great that even the jury's full knowledge of the agreement is insufficient to protect the fundamental fairness concepts inherent in the due process clause. The Court concluded that the government cannot offer favorable treatment to a prosecution witness contingent upon the success of the prosecution. Such an agreement is an invitation to perjury since the premium set by the government relates not to complete and truthful testimony but rather to result-oriented testimony. *Id.*, at 1531–1532.

In *Williamson v. United States*, 311 F.2d 441 (5th Cir., 1962), *cert. denied*, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 724 (1965), the Court reversed a conviction for possession of illicit liquor because the informer who made the government's case had been promised a specified sum of money for successfully incriminating specific defendants. The *Williamson* Court, referring to the law of entrapment, stated that, absent some proper justification or explanation, the courts cannot sanction a contingent fee arrangement to produce evidence against particular named defendants as to crimes not yet committed. *Id.*, at 444. The Court noted that such an arrangement might tend to cause a "frameup" and that the opportunities for abuse are too obvious to require elaboration. In his special concurrence to *Williamson*, Judge John Brown agreed with the result, but noted that the case was not so much an aspect of entrapment but rather presented questions regarding the fundamental rights of defendants in the *means* used to "make" the case. *Id.*, at 445 (emphasis added). The progeny of *Williamson* make it clear that a contingent arrangement with an informer is improper when as here, "the specific defendant was picked out for the informer's efforts by a government agent." *United States v. Lane*, 693 F.2d 385, 387–388 and cases cited therein (5th Cir.1982).

Perhaps the most detailed discussion of the scope of *Williamson* lies in *United States v. McClure*, 577 F.2d 1021 (5th Cir. 1978). The *McClure* Court discussed the facts, holdings and concurring opinion in *Williamson* and determined the facts of *McClure* to be outside the ambit of *Williamson*. *McClure* reviewed subsequent decisions of the Supreme Court which have left open the possibility that there may be some cases "in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." This "possibility" reflects the concerns expressed by Judge Brown in *Williamson*. See *McClure, supra*, at page 1022 and cases cited therein.

*Williamson* has been confined to a narrow set of circumstances. Factors that militate against application of *Williamson* include the possibility that the informant has been instructed in the law of entrapment, that a government agent rather than the informant "made the buy," and that the government agent did not know the identity of the suspect or defendant and therefore "did not target appellant as his prey." *McClure*, at page 1022. Other possible factors which would preclude the application of *Williamson* to a case include possession by the government agents of "such certain knowledge" that a targeted defendant has engaged in illicit dealings as to justify a contingent agreement (*Williamson*, at 444), or the attendance at or witnessing of transactions involving the targeted defendant so as to foreclose the possibility of fabrication on the part of the informant. *McClure, supra; see also, United States v. Jenkins*, 480 F.2d 1198 (5th Cir.), *cert. denied*, 415 U.S. 913, 94 S.Ct. 256, 38 L.Ed.2d 151 (1973).

The Court cannot find, on the evidence before it, that any of the above factors are present in this case. On the contrary, at the time the agreement was made with Quiroga, it is clear from the transcript of the debriefing that state agents and prosecutors were quite uncertain whether they

or Quiroga could "do" Satterwhite. Further, no agents or other government witnesses or evidence corroborates Quiroga's testimony regarding the essence of the allegations leveled against Satterwhite. The totality of the circumstances indicate that Quiroga was indeed sent out on a mission to specifically "get" Satterwhite, propelled by the substantial emoluments offered by the state prosecutors.

The government seeks comfort in *United States v. Kimble*, 719 F.2d 1253 (5th Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). The Defendants in that case were convicted largely on the testimony of a key witness who earlier entered a guilty plea, agreeing to cooperate with federal authorities and testify before grand and petit juries. He was to receive a lenient sentence conditioned on the acceptance of the adequacy of his cooperation. The convicted Defendants contended on appeal that the testimony should have been excluded due to the nature of the plea agreement. *Kimble* is not controlling here. In that case there was no mention of any specific Defendant being targeted by the government. *Williamson* and the issues presented therein were not even addressed by the *Kimble* Court. It is simply not applicable.

When the facts of this case are viewed in light of the above discussion, the Court is convinced that the admission of Quiroga's testimony violates due process. However unwittingly done, the Assistant District Attorney and state agents, totally consumed with the obsession to "get" Satterwhite, created a situation which was indeed an invitation to Quiroga to commit perjury. The state's attorney made it abundantly clear to Quiroga that knowing the truth would not make Quiroga free. Quiroga must learn more "truth," he must seek truth sufficient to obtain an indictment against Satterwhite. Further, while he did not obtain one shred of additional evidence nor testify about a single incriminating fact occurring after his plea bargain, it develops that Quiroga was somehow loaded with information and knowledge that would indict and convict Satterwhite with ease.

The government expresses concern that exclusion of this testimony imperils its right to obtain evidence from informants and co-conspirators under prearranged plea agreements. This is not so. This type of evidence has proven consistently dependable and often times essential to apprehend and convict violators of our laws. It is exceptionally valuable in combating the narcotics problem that plagues us. Contingent agreements similar to the one in issue are proper under compelling justifications and circumstances (as defined by *Williamson's* progeny) which are absent here.

Accordingly, the Court holds the testimony of Cesar Quiroga inadmissible and excludes such evidence from the record. Appropriate instructions will be given the jury concerning this evidence.

However, in light of the evidentiary record in this case, absent the testimony of Quiroga, the Court DENIES the motion of the Defendant Satterwhite for acquittal. For reasons stated elsewhere, the Court does GRANT said Defendant's motion for a mistrial. The Court having heretofore overruled the motions of the remaining Defendants for dismissal and, alternatively, for mistrial, this case shall proceed as to the Defendants Snyder, Vasquez and Baresh.