**UNITED STATES of America,
Plaintiff-Appellee**

v.

**Donald Gene HENTHORN and Tom D.
Riley, Defendants-Appellants.**

**No. 86–2278.**

United States Court of Appeals,
Fifth Circuit.

April 14, 1987.

David Randell, Houston, Tex., for Donald Gene Henthorn.

James E. Reaves, George McCall Secrest, Jr., Houston, Tex., for Tom D. Riley.

Mervyn Hamburg, Atty., Dept. of Justice, Washington, D.C., Henry K. Oncken, U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., for the U.S.

Before THORNBERRY, GEE, and REAVLEY, Circuit Judges.

GEE, Circuit Judge:

Donald Henthorn and Tom Riley appeal their convictions for conspiracy to possess with intent to distribute cocaine in violation

of 21 U.S.C. § 846. Our review reveals no reversible error and we accordingly affirm.

## I. *The Facts*

In 1984 Donald Henthorn moved to the lower Rio Grande Valley in Texas to start up a business of smuggling electronic goods into Mexico.[1] Henthorn, an experienced pilot, had served for many years in the CIA-operated Air America in Southeast Asia. He hired Harold Larsen, a former Air America pilot with experience in the electronics smuggling business, to help set up the business and to get the required certificates and permits from the FAA. Larsen also knew people in Mexico who had access to landing strips and arranged a meeting between his new employer and Juan Cabrera, an importer of illegal electronic goods. The first meeting occurred in Veracruz when Larsen flew down there with Henthorn and three of Henthorn's associates: Ivan Barandyka, Bill Lawrence, and appellant Tom Riley. On this trip, Larsen overheard Cabrera and Barandyka discussing cargo worth $2.2 million, a figure far above the $60,000 to $80,000 value of a customary load of electronic goods. Suspicious of his employer, Larsen called the Drug Enforcement Administration (DEA) office upon his return to Texas. He was, however, unable to speak with any agent at that time.

A month later Larsen, Henthorn, and Lawrence returned to Veracruz to visit Cabrera. Larsen waited in Veracruz while the others flew to Aruba, an island off the coast of Venezuela. When the others failed to return in ten days, Larsen flew to Texas and again called the DEA. He spoke with Agent Michael Harper about his suspicions and Harper initiated an investigation of Henthorn. Several weeks later Larsen notified Agent Harper that he had delivered $50,000 in cash to an aircraft engine repair facility for Henthorn and that

Henthorn had revealed that he was no longer working for Barandyka. Harper then asked Larsen to record all his phone conversations with Henthorn.

For the next two months, Larsen assisted in the investigation and kept in daily contact with Agent Harper. Harper instructed Larsen to use drug terms whenever talking with Henthorn. This surveillance failed to reveal any specific drug deals, so Agent Harper decided to conduct a reverse sting operation. He posed as a seller of 45 kilos of cocaine and had Larsen introduce him to Henthorn. Henthorn agreed to arrange a buyer for the drugs. Following the ritual courting between unknowns in the drug world, Henthorn enlisted Larsen's aid in checking out Harper's (known to Henthorn as Mike Harris) credentials.

After Larsen corroborated the DEA Agent's story, Henthorn told Harper that he had a buyer for the cocaine, and that the buyer was Tom Riley. The final transaction occurred in a motel room in Harlingen, Texas. There, Henthorn and Harper met with Riley in Riley's room. Although the deal was supposed to involve 20 kilos, Riley said he had only $90,000 and would have to purchase the rest at a later date. Harper agreed to a restructured deal in which he would sell five kilos for the $90,000, and Henthorn assured him that he could arrange another buyer for the remainder of the cocaine. After counting the money, the men met with Kenneth Hooper,[2] the man who was to test the cocaine. DEA Agents then arrested all three men. The government prosecuted this case twice: the first trial resulted in a hung jury; the second secured the convictions of Henthorn, Riley, and Hooper.

## II. *The Informant*

Henthorn contends that the government's use of Larsen as a paid in-

---

**1.** This type of business is legal in the United States, but illegal in Mexico. After dark, planes laden with electronic goods clear United States Customs and travel to private airstrips inside of Mexico. Once they land, they unload their cargo and leave as fast as possible because of the danger from both Mexican police and hijackers.

**2.** Kenneth Hooper was a codefendant at trial, but his appeal was dismissed for want of prosecution.

former violated his due process rights guaranteed by the fifth amendment. He paints the government's promise of a $25,000 payment as an impermissible contingent fee arrangement. The law proscribes certain contingent fee arrangements that by themselves call into question the truthfulness of an informant's testimony.[3] *See Williamson v. United States,* 311 F.2d 441 (5th Cir.1962). We have noted, however, that the *Williamson* holding applies only to "cases in which the government directs the informant to implicate government-pretargeted specific defendants." *United States v. Yater,* 756 F.2d 1058, 1067 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985). Henthorn's due process argument fails because the DEA neither pretargeted Henthorn nor did they pay Larsen in an impermissible manner.

The facts belie Henthorn's argument that the government pretargeted him. Agent Harper at no time asked an informant to get the goods on Henthorn in exchange for money. The informant in this case had never worked in that capacity with the DEA before.[4] Larsen talked to the DEA voluntarily about his suspicions of Henthorn. The DEA decided to investigate based on Larsen's suspicions and Henthorn's connections with Barandyka. They enlisted Larsen's help in the investigation and promised him money only for expenses. The facts do not indicate that Henthorn was pretargeted.

In addition, the fee arrangement used here does not call into question the veracity of Larsen's testimony. Larsen became aware of his compensation only after the first trial had resulted in a hung jury. Until that time, Larsen had received only $500 for expenses. He testified that he did not expect any additional compensation. He cooperated voluntarily with no expectation of reward. After the arrest, Agent Harper had recommended to his superiors a $25,000 reward based on the overall value of Larsen's cooperation. They paid Larsen $13,000 after the first trial but held up on the rest because of a shortage of agency funds. Although Larsen still had not received the additional $12,000 at the time of the second trial, this does not describe an impermissible payment for testimony. Larsen's testimony in the second trial did not differ from his previous testimony. Agent Harper recommended the entire $25,000 after the *arrest.* The government paid the $13,000 after a trial that resulted in a hung jury—hardly a favorable result for the government. In these circumstances we cannot say that the government's actions in this case were "essentially revolting to an ordered society." *Williamson,* 311 F.2d at 445 (Brown, J., concurring specially).

Harper did conduct a reverse-sting operation with Larsen's aid. This does not mean that the government pretargeted Henthorn under the *Williamson* analysis. It raises only the issue of entrapment—an issue that Henthorn's defense counsel ably presented to the jury. The jury, however, rejected the entrapment defense. We will not disturb their decision. Harper's actions did not rise to the level of egregiousness that violates the doctrine of fundamental fairness. *See United States v. Lane,* 693 F.2d 385, 388 (5th Cir.1982). We therefore hold that Larsen's cooperation did not violate the appellant's due process rights.

### III. *Extrinsic Offenses*

At the second trial, the government wanted to introduce evidence of extrinsic offenses committed by Tom Riley. They offered two witnesses to prove these offenses: a police officer and Ferris Ashley. The trial judge conducted a hearing outside the presence of the jury to decide the admissibility of the proposed evidence. He permitted Ashley's testimony, but not the police officer's testimony. Appellant Riley argues that the district court erred in allowing this testimony because its unfair prejudice substantially outweighed its probative value (Fed.R.Evid. 403) and that it

---

3. The nature of this proscription will be considered by this Court *en banc* in another case. *See United States v. Cervantes-Pacheco,* 800 F.2d 452 (5th Cir.1986) (rehearing *en banc* granted).

4. Larsen testified that he had received $150 two years earlier from the DEA as a consultation fee relating to electronic goods smuggling operations.

was used only to prove the bad character of the defendant (Fed.R.Evid. 404(b)). We uphold the district court's ruling.

■ Ferris Ashley testified to several occasions the previous year when both he and Tom Riley were involved in cocaine transactions in California. Ashley testified from personal knowledge and admitted that he was a paid government informer. The jury could easily accept his testimony as proof that the offenses occurred. The district judge reviewed the proposed evidence under the proper standard: he determined first that the extrinsic offense evidence was relevant to Riley's intent rather than only to his bad character, and second that its probative value outweighed its undue prejudice. *See United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). Ashley's testimony of Riley's involvement in cocaine deals was relevant to Riley's intent in the case. The similarity of the extrinsic offenses to the charged offense, all deals involving large amounts of cocaine, and the temporal proximity of the offenses strengthens the relevancy of Ashley's testimony. *See id.* at 915. The evidence establishes an identity of the significant state of mind and is therefore relevant to Riley's intent to commit the charged offense.

■ The second step of the analysis weighs the probity of the evidence against its unfair prejudice. Part of this analysis hinges upon the government's need for the testimony to prove intent. *Id.* at 914. Riley contends that his intent was never at issue and therefore the government did not have the requisite need for extrinsic offense evidence. We have decided, however, that in conspiracy cases, "the mere entry of a not guilty plea sufficiently raises the issue of intent to justify the admissibility of extrinsic offense evidence." *United States v. Gordon*, 780 F.2d 1165, 1174 (5th Cir.1986); *see also United States v. Roberts*, 619 F.2d 379, 383 (5th Cir.1980) ("Because of the unique nature of conspiracy charges, we cannot apply to them the policy suggested in *Beechum* of uniformly excluding extrinsic offense evidence when the defendant does not actively contest intent."). In addition to pleading not guilty, Riley attacked the credibility of two of the three government witnesses who testified against him. In this situation, the government was entitled to produce evidence of the extrinsic offenses to prove that Riley had the requisite intent to commit the crime.

■ The trial judge further minimized the possibility of prejudice by carefully instructing the jury on the use of Ashley's testimony both before Ashley testified and at the end of the trial. *See Gordon*, 780 F.2d at 1174. The probative value of such evidence outweighed any danger of unfair prejudice to Riley and the trial court therefore did not abuse its discretion in admitting the evidence.

■ After the district court's decision to admit Ashley's testimony, Henthorn moved for a severance under Rule 14 of the Federal Rules of Criminal Procedure. Henthorn asserts that the court erred in denying his motion because the extrinsic offense evidence would not have been admissible against him in a separate trial and that it unfairly prejudiced his right to a fair trial. Denials of Rule 14 motions are reviewable only for an abuse of discretion, and the appellant must demonstrate compelling prejudice against which the trial court was unable to afford protection. *United States v. Williams*, 809 F.2d 1072, 1084 (5th Cir.1987). In this case, Henthorn's cross-examination of Ashley revealed that Ashley did not even know Henthorn. Moreover, the judge instructed the jury that Ashley's testimony was probative only on the issue of Riley's intent. This case was relatively straightforward, with only two defendants; and the extrinsic offense evidence did not implicate Henthorn. The trial judge did not abuse his discretion in denying Henthorn's motion for a severance. *See United States v. Rhodes*, 569 F.2d 384, 390 (5th Cir.1978).

## IV. *Voir Dire*

■ Appellant Riley also contends that the district court impermissibly limited de-

fense inquiry during voir dire with respect to two prospective jurors. The court's questioning revealed that these two jurors had previously served in cocaine cases in which the juries had reached verdicts. The defense counsel wanted to ask if they had served in "dry" conspiracy cases. The judge did not permit the additional questions. The defense then challenged the two venire members for cause and the district court denied the challenge. The two prospective jurors were struck, although the record does not indicate whether they fell to the government's or the defendant's peremptory challenges. Riley relies on a case in which we found that

> the district court erred in denying the motions to quash the jury panel without allowing counsel for the defendants any opportunity to develop the nature and extent of the prior jury service of the twenty-seven members of the panel who had had prior jury service in narcotics cases.

*United States v. Montelongo,* 507 F.2d 639, 641 (5th Cir.1975). That situation, however, differs greatly than the situation in this case. Here, only two venire members had served in narcotics cases, and defense counsel knew that both of the prospective jurors had only served once before in a cocaine case. Riley's counsel knew more about the prospective jurors than did Montelongo's counsel. In addition, the trial judge has broad discretion in the conduct of voir dire and absent an abuse of discretion and a showing that Riley's rights have been prejudiced thereby, we will not disturb the scope and content of the voir dire. *United States v. Birdsell,* 775 F.2d 645, 652 (5th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1979, 90 L.Ed.2d 662 (1986). Riley has not shown that he had to use or even did use peremptory challenges to strike those two jurors, therefore allowing a biased juror on the jury. Furthermore, Riley does not demonstrate how the answer to his proposed question would have aided in his search to discover potential prejudice. Riley has not demonstrated that his rights have been prejudiced. The judge did not abuse his discretion in denying Riley's voir dire question.

## V. *Conclusion*

We find no reversible error in any of the appellants' arguments and therefore we AFFIRM.